1  Richard A. Huver (SBN 132945)
   THE HUVER LAW FIRM
2  655 West Broadway, Suite 1400
   San Diego, California 92101
3  Tel: (619) 961-4883
   Fax: (619) 961-4886
4  rhuver@huverlaw.com

5  Harris I. Steinberg (SBN 89288)
   5015 Estates Way
6  El Cajon, California 92020
   Tel: (619) 787-2650
7  harrissteinberg@gmail.com

8  Attorneys for Plaintiffs
        Plum Healthcare Group, LLC; GI Plum
9       Holdco, LLC; and Quince Holdings, LLC
        dba Pueblo Springs Rehabilitation Center
10

11              UNITED STATES DISTRICT COURT

12         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14  PLUM HEALTHCARE GROUP, LLC,      )   CASE NO. '15CV2747 W    MDD
    a California corporation; GI PLUM )
15  HOLDCO, LLC, a Delaware limited   )   **COMPLAINT FOR TORTIOUS**
    liability company; and QUINCE     )   **BREACH OF INSURANCE**
16  HOLDINGS, LLC dba PUEBLO          )   **CONTRACT AND DEMAND FOR**
    SPRINGS REHABILITATION            )   **JURY TRIAL**
17  CENTER,                           )
                                      )   [Compensatory and Punitive
18              Plaintiffs,           )   Damages]
                                      )
19          v.                        )   1.   Breach of Implied Covenant of
                                      )        Good Faith and Fair Dealing;
20  ONEBEACON PROFESSIONAL            )
    INSURANCE, a Bermuda corporation; )   2.   Declaratory Relief;
21  HOMELAND INSURANCE                )
    COMPANY OF NEW YORK, a            )   3.   Breach of Contract
22  Minnesota corporation; and DOES 1 )
    through 30,                       )
23                                    )
                Defendants.           )
24  _____  )

25

26        Plaintiffs, by their attorneys, bring this action on behalf of themselves, and

27  hereby allege as follows:

28  / / /

                                    -1-

**DEMAND FOR JURY TRIAL**

1.     Plaintiffs hereby demand a trial by jury.

**JURISDICTION AND VENUE**

2.     This Court has jurisdiction under 28 U.S.C. §1332(a)(1).  Plaintiff PLUM HEALTHCARE GROUP, LLC (hereafter "PLUM HEALTHCARE") is a California limited liability company with its principal place of business in San Marcos, California.  Plaintiff GI PLUM HOLDCO, LLC (hereafter "GI PLUM") is a Delaware limited liability company with its principal place of business in San Marcos, California.  Plaintiff QUINCE HOLDINGS, LLC dba PUEBLO SPRINGS REHABILITATION CENTER (hereafter "QUINCE HOLDINGS") is an Arizona limited liability company with its principal place of business in Tucson, Arizona.  PLUM HEALTHCARE, GI PLUM and QUINCE HOLDINGS are referred to collectively hereafter as PLAINTIFFS.

3.     Defendant ONE BEACON PROFESSIONAL INSURANCE and DOES 1 through 5 (hereinafter collectively "ONE BEACON") are corporations incorporated under the laws of Bermuda, with their principal place of business in Minnesota, and are licensed to issue insurance policies in the state of California. Defendant HOMELAND INSURANCE COMPANY OF NEW YORK and DOES 6 through 10 (hereinafter collectively referred to as "DEFENDANTS") are corporations incorporated under the laws of Minnesota, with their principal place of business in New York, and are licensed to issue insurance policies in the state of California.  The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4.     Venue is proper in this Court because the underlying "HARRIS LAWSUIT" was filed in San Diego and the claim denial occurred in San Diego, and one or more defendants either maintain executive offices in San Diego County, conduct substantial business and transactions in San Diego County, and/or because defendants have received substantial compensation from the sales

1  of liability insurance policies in this County by doing business here, all of which

2  had an effect in this County.

3       5.    PLAINTIFFS are ignorant of the true names and capacities of the

4  defendants sued herein as DOES 1 through 30, inclusive, and therefore sue such

5  defendants by such fictitious names.  PLAINTIFFS allege said DOE defendants

6  are additional insurers who provided insurance coverage to PLAINTIFFS during

7  the relevant time period and had a duty to defend and indemnify PLAINTIFFS as

8  insureds, additional insureds and/or an intended beneficiary of the claims against

9  them.  PLAINTIFFS will amend this Complaint to allege their true names and

10 capacities when the same have been ascertained.  PLAINTIFFS are informed and

11 believe and upon such information and belief allege that each of the fictitiously

12 named defendants are sued as principals, representatives, shareholders, agents,

13 servants, and/or employees and were at all times herein mentioned acting within

14 the course and scope of the aforesaid relationships, in concert and with the

15 authorization, consent and ratification of all other defendants.

16      6.    PLAINTIFFS are informed and believe and upon such information

17 and belief allege that at all times herein mentioned DEFENDANTS, and each of

18 them, were the principals, representatives, shareholders, agents, servants, and/or

19 employees of the remaining defendants, and were at all times acting within the

20 purpose and scope of the aforesaid relationships, in concert and with the

21 authorization, consent and ratification of all the other defendants.

22                    **FIRST CAUSE OF ACTION**

23              (BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS -
               FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
24            AND FAIR DEALING - FAILURE TO DEFEND AND INDEMNIFY)

25      7.    PLAINTIFFS refer to and incorporate herein by reference the

26 allegations set forth in paragraphs 1 through 6 above, as though set forth in full

27 herein.

28 / / /

-3-

8.     On or about August 4, 2014, DEFENDANTS issued a written insurance contract (No. LTC-6366-14) to plaintiff GI PLUM HOLDCO, LLC and its subsidiaries listed on Endorsement 2 of the policy as named insureds (hereinafter referred to as the "POLICY").  A copy of the POLICY is attached hereto as Exhibit A, and is incorporated herein by reference.

9.     The POLICY promised to provide all PLAINTIFFS with a broad range of insurance protection, including the specific promise of "General Liability Insurance," covering PLAINTIFFS against "any loss which the Insured is legally obligated to pay as a result of a covered claim alleging Bodily Injury..."  Further, the POLICY agreed to provide indemnity protection up to $1,000,000 for each claim for General Liability.  Additionally, per the terms of the General Liability Coverage under subsection (F), DEFENDANTS agreed and promised to provide PLAINTIFFS with "Defense and Supplementary Payments" as follows:

(F)     Defense and Supplementary Payments:

The Underwriter has the right and the duty to defend any Claim that is covered by INSURING AGREEMENTS (A), (B), and (C) of this Policy, **even if any of the allegations of such Claim are groundless, false or fraudulent.**  In addition to the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C), the Underwriter will pay Defense Expenses and will: . . .  (Emphasis added.)

10.     During the term of the POLICY, PLAINTIFFS were sued by Janice Harris for "bodily injury" losses she claimed were caused by the negligence of PLAINTIFFS herein, as well as others (hereinafter referred to as the "HARRIS LAWSUIT" or "INJURY CLAIM.")

11.     PLAINTIFFS tendered the HARRIS LAWSUIT to DEFENDANTS for a legal defense and indemnity under the terms of DEFENDANTS' General Liability Coverage.  On or about December 9, 2014, DEFENDANTS sent PLAINTIFFS a letter expressly denying PLAINTIFFS any insurance protection or

1   coverage for Legal Defense or Indemnity of the HARRIS LAWSUIT.  Thereafter,

2   DEFENDANTS repeatedly and continuously refused to undertake PLAINTIFFS'

3   defense in the HARRIS LAWSUIT or provide any insurance benefits

4   DEFENDANTS promised in the POLICY.

5        12.    DEFENDANTS' refusal to defend and/or indemnify PLAINTIFFS

6   for the HARRIS LAWSUIT was wrongful and in violation of the express promises

7   of insurance protection which PLAINTIFFS paid for in purchasing the POLICY.

8        13.    DEFENDANTS, and each of them, breached their duty of good faith

9   and fair dealing owed to PLAINTIFFS regarding their duty to provide a legal

10   defense and indemnity in at least the following respects:

11        (a)    DEFENDANTS denied coverage to PLAINTIFFS, claiming

12   that the HARRIS LAWSUIT was excluded under Exclusion (D)(7) as a claim by

13   an "Insured against another current or former Insured."  DEFENDANTS at all

14   times knew that Ms. Harris could not be an "Insured" for purposes of Exclusion

15   (D)(7) if at the time of her injury she was not acting within the capacity and scope

16   of her duties to the named insureds.  The HARRIS LAWSUIT expressly alleged at

17   paragraph 22 of the complaint that Ms. Harris' injuries "occurred outside the

18   scope of her employment as Quince's Director of Nursing."  As such,

19   DEFENDANTS knew that Ms. Harris was not an "Insured" for purposes of

20   Exclusion (D)(7) at the time of her injury if these allegations were true, and that

21   DEFENDANTS' express duty to defend PLAINTIFFS was not excused under

22   Exclusion (D)(7).  Therefore, DEFENDANTS knew that at least a "potential" for

23   coverage existed which required DEFENDANTS to defend PLAINTIFFS against

24   the HARRIS LAWSUIT and its allegations;

25        (b)    DEFENDANTS and their employees and representatives who

26   handled the INJURY CLAIM knew or should have known that under California

27   law, a claim for legal defense cannot be denied if any "potential for coverage"

28   existed and that insurers such as DEFENDANTS owed their insureds such as

PLAINTIFFS a duty to look for coverage for the HARRIS LAWSUIT.

DEFENDANTS failed and refused to look for coverage of the HARRIS

LAWSUIT and only looked for reasons to deny PLAINTIFFS' claim for benefits;

(c)     After PLAINTIFFS protested DEFENDANTS' refusal to

defend and indemnify the HARRIS LAWSUIT, DEFENDANTS raised a second

excuse for refusing to defend PLAINTIFFS.  DEFENDANTS raised Exclusion

(B)(9) which excludes claims for bodily injury if the injury arises out of the "use

of a motor vehicle."  But DEFENDANTS refused to consider the fact that

Exclusion (B)(9) contained an "exception" for "non-owned motor vehicles,"

which required DEFENDANTS to defend and indemnify as excess coverage over

any other insurance, whether collectible or not.  DEFENDANTS at all times knew

that the motor vehicle involved in the HARRIS LAWSUIT was a "non-owned

vehicle", thereby rendering DEFENDANTS' Exclusion (B)(9) questionable and

inapplicable to the INJURY CLAIM.  DEFENDANTS knew that no other

collectible motor vehicle insurance coverage existed, meaning DEFENDANTS

were the primary insurance coverage for the INJURY CLAIM;

(d)     When DEFENDANTS denied PLAINTIFFS' claim for a legal

defense and indemnity, DEFENDANTS did not have facts showing that either

Exclusion (D)(7) or (B)(9) conclusively applied to PLAINTIFFS' claim, yet

DEFENDANTS denied coverage anyway;

(e)     DEFENDANTS knew or reasonably should have known that

they were required to defend PLAINTIFFS, even on claims that were "groundless,

false or fraudulent," in addition to those that were potentially covered.

DEFENDANTS ignored the potential that the HARRIS LAWSUIT's allegations

of Ms. Harris being injured "outside the course and scope of her employment"

might be true, which would negate DEFENDANTS' Exclusion (D)(7) and create a

potential for coverage, thereby obligating DEFENDANTS to defend and

indemnify PLAINTIFFS;

1    (f)    DEFENDANTS failed to reasonably and promptly investigate

2  PLAINTIFFS' claim for legal defense benefits by refusing to defend immediately

3  while at the same time DEFENDANTS engaged in a purported investigation that

4  was really a search for excuses to avoid their contractual obligation to immediately

5  defend their insureds;

6    (g)    DEFENDANTS failed to provide PLAINTIFFS with a legal

7  defense against the claims asserted in the HARRIS LAWSUIT at a time when

8  DEFENDANTS had insufficient information within their possession to justify said

9  action;

10    (h)    DEFENDANTS failed to provide PLAINTIFFS with a legal

11  defense and indemnity against the claims asserted in the HARRIS LAWSUIT

12  without obtaining all necessary information bearing on PLAINTIFFS' request for

13  a defense;

14    (I)    DEFENDANTS misrepresented to PLAINTIFFS pertinent facts

15  and policies and provisions relating to the POLICY, including but not limited to

16  DEFENDANTS failing and refusing to defend PLAINTIFFS and asserting that no

17  coverage was available under the POLICY, when, in fact, coverage did exist;

18    (j)    DEFENDANTS failed to reasonably and promptly investigate

19  and process PLAINTIFFS' claims for a legal defense and indemnity;

20    (k)    DEFENDANTS did not attempt in good faith to effectuate a

21  prompt, fair and equitable settlement of the allegations against PLAINTIFFS in

22  the HARRIS LAWSUIT and/or PLAINTIFFS' claim for a legal defense against

23  the HARRIS LAWSUIT in which liability had become reasonably clear;

24    (l)    DEFENDANTS failed to provide a reasonable explanation of

25  the basis relied upon in the POLICY, in relation to the applicable facts, for the

26  denial of PLAINTIFFS' request for a legal defense against and indemnity of the

27  HARRIS LAWSUIT;

28  / / /

1      (m)    PLAINTIFFS are informed and believe and thereon allege that

2 DEFENDANTS breached their duty of fair dealing and good faith owed to

3 PLAINTIFFS regarding the duty to defend and/or indemnify PLAINTIFFS by

4 other acts or omissions of which PLAINTIFFS are presently unaware.

5 PLAINTIFFS will seek leave of court to amend this Complaint at such time as

6 PLAINTIFFS discover the other acts or omissions of said DEFENDANTS

7 constituting such breach.

8      14.    The conduct as alleged against DEFENDANTS, and each of them, as

9 set forth herein was unreasonable under the circumstances and a breach of the

10 POLICY.

11      15.    As a proximate result of the aforementioned wrongful conduct of

12 DEFENDANTS, and each of them, PLAINTIFFS have suffered, and will continue

13 to suffer in the future, damages under said POLICY, including but not limited to:

14 (a) attorneys' fees and costs and settlement payments incurred to defend against

15 the claims in the HARRIS LAWSUIT; (b) costs to investigate the claims asserted

16 in the HARRIS LAWSUIT, including consultant and expert fees and other

17 expenses; (c) attorneys' fees and costs to obtain benefits owed under the POLICY,

18 to defend against and settle the HARRIS LAWSUIT, and to prosecute this action;

19 and (d) other damages, together with interest, in an amount to be proven at the

20 time of trial.

21      16.    DEFENDANTS engaged in despicable conduct as described herein

22 which was done with a conscious disregard of PLAINTIFFS' rights and with the

23 intent to vex, injure or annoy PLAINTIFFS, such as to constitute oppression, fraud

24 or  malice under California Civil Code Section 3294, entitling PLAINTIFFS to

25 punitive damages in an amount appropriate to punish or set an example of

26 DEFENDANTS, and each of them.

27 / / /

28 / / /

## SECOND CAUSE OF ACTION

### (BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS - FOR DECLARATORY RELIEF)

17.     PLAINTIFFS refer to and incorporate herein by reference the allegations set forth in paragraphs 1 through 15 above, as though set forth in full herein.

18.     Pursuant to the terms of the POLICY, PLAINTIFFS contend they were and are entitled to a defense against and indemnity of the claims asserted against PLAINTIFFS in the HARRIS LAWSUIT.  PLAINTIFFS have submitted all necessary documents and information to DEFENDANTS, and each of them, to support their request for a defense and indemnification.

19.     An actual controversy exists between PLAINTIFFS and DEFENDANTS, and each of them, in that PLAINTIFFS contend they were and are entitled to a defense against and indemnity of the claims asserted in the HARRIS LAWSUIT, and the settlement paid by PLAINTIFFS.  DEFENDANTS, and each of them, have repeatedly denied PLAINTIFFS' claims for benefits under the POLICY.

20.     PLAINTIFFS request a judicial declaration of the rights of all parties pursuant to the terms and conditions of the POLICY, and further request a judicial declaration that PLAINTIFFS were and are entitled to benefits under the terms of the POLICY, including but not limited to, defense against and indemnity of the claims asserted in the HARRIS LAWSUIT.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**THIRD CAUSE OF ACTION**

(BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS -
FOR BREACH OF CONTRACT - FAILURE TO DEFEND AND
FAILURE TO INDEMNIFY)

21.     PLAINTIFFS refer to and incorporate herein by reference the allegations set forth in paragraphs 1 through 15 above, as though set forth in full herein.

22.     The POLICY of insurance described in paragraphs 1 through 15 above was a written contract between PLAINTIFFS and DEFENDANTS.

23.     PLAINTIFFS have complied with, or are excused from complying with, all conditions precedent to their entitlement to a defense and indemnity under the POLICY.

24.     DEFENDANTS, and each of them, had an independent duty, under the terms of the POLICY, to investigate the claims made and allegations asserted in the HARRIS LAWSUIT.  DEFENDANTS, and each of them, had a duty, under the terms of the POLICY, to defend and indemnify PLAINTIFFS against the claims made and allegations asserted in the HARRIS LAWSUIT.

25.     DEFENDANTS, and each of them, breached their contract of insurance with PLAINTIFFS by failing and/or refusing to investigate adequately and completely the claims and allegations made against the PLAINTIFFS, and by failing and/or refusing to provide PLAINTIFFS with a defense against and indemnity of the HARRIS LAWSUIT, despite repeated requests to do so by PLAINTIFFS.

26.     As a proximate and legal result thereof, PLAINTIFFS have sustained damages, including but not limited to, attorneys' fees and costs, investigation costs, consultant fees, experts' fees, costs associated with settling the claims asserted in the HARRIS LAWSUIT against PLAINTIFFS, and other costs and

/ / /

1  expenses, together with interest thereon, the exact amount of which will be proven

2  at the time of trial.

3                                  **PRAYER**

4          **WHEREFORE**, all PLAINTIFFS pray for judgment against all

5  DEFENDANTS on their first cause of action as follows:

6          1.      Damages for failure to provide benefits under the terms of the

7  POLICY in an amount to be determined at the time of trial;

8          2.      Attorneys' fees and costs incurred to obtain insurance benefits;

9          3.      Punitive and exemplary damages in an amount appropriate to punish

10  or set an example of the DEFENDANTS;

11         4.      For pre- and post-judgment interest;

12         5.      For costs of suit incurred herein; and

13         6.      For such other and further relief as the Court deems just and proper.

14         **WHEREFORE**, all PLAINTIFFS pray for judgment against all

15  DEFENDANTS on their second cause of action as follows:

16         1.      A judicial declaration that PLAINTIFFS were and are entitled to

17  benefits under the terms of the POLICY, including defense and indemnity benefits;

18         2.      For costs of suit incurred herein; and

19         3.      For such other and further relief as the Court deems just and proper.

20         **WHEREFORE**, PLAINTIFFS, and each of them, pray for judgment against

21  all DEFENDANTS on their third cause of action as follows:

22         1.      Damages for failure to provide benefits under the terms of the

23  POLICY in an amount to be determined at the time of trial;

24         2.      Attorneys' fees and costs incurred to obtain insurance benefits;

25         3.      For pre- and post-judgment interest;

26         4.      For costs of suit incurred herein; and

27  / / /

28  / / /

1          5.     For such other and further relief as the Court deems just and proper.

2

3   Dated:   December 8, 2015                THE HUVER LAW FIRM

4
                                            By:   s/ Richard A. Huver
5                                                 Richard A. Huver
                                                  Email: rhuver@huverlaw.com
6

7
                                            By:   s/ Harris I. Steinberg
8                                                 Harris I. Steinberg
                                                  Email:  harrissteinberg@gmail.com
9
                                                  Attorneys for Plaintiffs
10                                                Plum Healthcare Group, LLC; GI
                                                  Plum Holdco, LLC; and Quince
11                                                Holdings, LLC dba Pueblo Springs
                                                  Rehabilitation Center
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF EXHIBITS</u>

Exhibit A        OneBeacon Professional Insurance Long Term        Pages 13-78
                 Care - Primary Policy, GI Plum Holdco, LLC;
                 Account No: 8697; Policy No: LTC-6366-14

## OneBeacon
### PROFESSIONAL INSURANCE™

onebeaconpro.com

| RE: | Long Term Care - Primary<br>GI Plum Holdco, LLC | Policy |
|---|---|---|

Account No:  8697          Policy No:  LTC-6366-14

199 Scott Swamp Road          860.321.2888 t
Farmington, CT 06032          860.321.2889 f

## <u>OneBeacon Professional Insurance Medical Professional and General Liability Claim Reporting Guidelines</u>

Following are examples of the types of events that should be reported in accordance with the general conditions regarding Reporting of Claims, Occurrences and Circumstances under your One Beacon policy:

- Medication errors resulting in injury and/or requiring further treatment (including patient not receiving medication; receiving incorrect dosage of medication; or receiving wrong medication)
- Falls resulting in injury
- Family/Patient complaints of inadequate care resulting in injury
- Events reported to the state Dept of Health, other regulatory body or police
- Visitor injuries
- Unexpected death
- Serious injury (including, but not limited to, paraplegia; quadriplegia; or severe neurological impairment)
- Elopement
- Allegations of physical or sexual abuse
- Sentinel events
- Oral or written demands for damages
- Lawsuits
- Communication from an attorney regarding any of the events noted above
- Request from an attorney for medical records
- Any other event the Insured reasonably believes could result in a Claim under the policy

***The above list of events is not meant to be exhaustive or exclusive. Nothing contained in or omitted from this document should be deemed a waiver of any terms or conditions of any applicable policy. These guidelines are provided for general informational purposes only and should not be considered or relied upon as coverage, legal or risk-management advice. Readers should consult the specific terms of their policy and their own legal counsel for advice.***

***Please report all claims and reportable events to:***

Chief Claims Officer
OneBeacon Professional Insurance
199 Scott Swamp Road
Farmington, CT 06032
877.256.5067 (fax)
obpiclaims@onebeaconpro.com

**Homeland Insurance Company of New York**
One Beacon Lane
Canton, MA 02021
*(hereinafter referred to as the "Underwriter")*



**Policy Number:** LTC-6366-14

## DECLARATIONS

### LONG TERM CARE ORGANIZATIONS
### PROFESSIONAL LIABILITY, GENERAL LIABILITY AND EMPLOYEE
### BENEFIT LIABILITY POLICY, INCLUDING LEGAL/MEDIA AND
### EVACUATION EXPENSE REIMBURSEMENT

**PORTIONS OF THIS POLICY PROVIDE CLAIMS MADE AND REPORTED COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR AN APPLICABLE EXTENDED REPORTING PERIOD AND REPORTED IN ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS.  PLEASE READ THIS POLICY CAREFULLY.**

| | |
|---|---|
| ITEM 1.   **FIRST NAMED INSURED:**<br><br>Name and Principal Address:<br>GI Plum Holdco, LLC<br>100 E San Marcos Blvd Ste 200<br>San Marcos, CA 92069 | ITEM 2.   **POLICY PERIOD:**<br><br>(a)  Inception Date: August 4, 2014<br>(b)  Expiration Date: August 4, 2015<br>Both dates at 12:01 a.m. at the<br>Principal Address in ITEM 1. |

**ITEM 3.       COVERAGE/TYPE/RETROACTIVE DATE(S)**

| Coverage | Type | Retroactive Date |
|---|---|---|
| A.  Healthcare Professional Liability | Claims Made | Various |
| B.  General Liability | Claims Made | Various |
| C.  Employee Benefit Liability | Claims Made | Various |
| D.  Evacuation Expense | Expense Reimbursement | Not Applicable |
| E.  Legal/Media Expense | Expense Reimbursement | As Per Insuring Agreement (A) |

**ITEM 4.       LIMIT(S) OF LIABILITY; DEDUCTIBLE/SELF-INSURED RETENTION**

A.   Healthcare Professional Liability
     Each Claim...................................................................$1,000,000
     Aggregate for all Claims..................................................$3,000,000
     Deductible <u>X</u>     Self-Insured Retention
          Per Claim.............................................................$250,000
          Aggregate...........................................................$5,000,000

B.   General Liability
     Each Claim................................................................ $1,000,000
     Products and Completed Operations Hazard...........................INCLUDED
     Damage to Rented Premises..........................................$50,000
     Aggregate for all Claims............................................. $3,000,000
     Deductible <u>X</u>     Self-Insured Retention
          Per Claim.............................................................$250,000
          Aggregate...........................................................$5,000,000

Ex. A, Page 15 of 78

C.   Employee Benefit Liability
        Each Claim.................................................................$1,000,000
        Aggregate for all Claims...............................................$3,000,000
        Deductible X̲      Self-Insured Retention
            Per Claim.............................................................$1,000
            Aggregate............................................................N/A

D.   Evacuation Expense
        Each Evacuation........................................................$100,000
        Aggregate for all Evacuations.....................................$100,000

E.   Legal/Media Expense
        Each Legal Defense Proceeding...................................$100,000
        Aggregate for all Legal Defense Proceedings...............$100,000

---

**ITEM 5.      PREMIUM**

A.   Policy Premium: $3,125,000

B.    Minimum Earned Premium:  25% of Policy Premium shown above.

 X̲  This Policy provides coverage for acts of terrorism as defined in the Terrorism Risk Insurance
     Act of 2002 (the "Act").  The premium attributable to this coverage is $0.00.

___ This Policy specifically excludes coverage for acts of terrorism as defined in the Act.

---

**ITEM 6.      ALL NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER UNDER GENERAL
         CONDITION (C) OF THE POLICY MUST BE ADDRESSED TO:**

        Chief Claims Officer
        OneBeacon Professional Insurance
        199 Scott Swamp Road
        Farmington, CT 06032
        obpiclaims@onebeacon.com

        **ALL OTHER NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER UNDER
        THIS POLICY MUST BE ADDRESSED TO:**

        OneBeacon Professional Insurance
        199 Scott Swamp Road
        Farmington, CT 06032

---

**ITEM 7.      POLICY FORM AND ENDORSEMENTS ATTACHED AT ISSUANCE:**
        HPF-20002-02-09

| |
|---|
| HPE-00006-07-08 Medical Expenses for Bodily Injury |
| HPE-00004-03-09 Separate Limits for Scheduled Named Insureds and Policy Aggregate Limit Endorsement |
| HPE-20006-03-09 Coverage Enhancements Endorsement |
| HPE-00017-07-08 Additional Insured Mortgagee Landlord or Lessor |
| HPE-2PLUM-11-10 Amend Claims Made Trigger on Renewal |
| HPE-STDV-02-10 Amounts Paid Within Deductible Will |
| HPE-20001-03-09 Additional Insured |
| HPE-00032-08-09 Blanket Waiver of Subrogation - Insuring Agreement (B) Only |
| HPE-00008-07-08 Additional Insured Endorsement - GL Only |
| HPE-20028-10-10 Amend Section III Exclusion (B)(4) |

HPD-20001-02-13

|  | HPE-20002-03-09 Schedule A- Named Insured |
|  | HPE-00064-07-11 Notice of Cancellation to Scheduled Party |
|  | HPE-20013-03-09 Limit Coverage to General Liability Only for Specified Insured Location(s) Endorsement |
|  | HPE-00039-08-09 Front Loss Only Within Deductible Endorsement |
|  | HPE-00062-04-11 Additional Named Insured - Related to Original Named Insured |
|  | HPE-00037-08-09 Maintenance Deductible |
|  | HPE-20039-12-10 Additional Insured-Primary and Noncontributory (GL) |

These Declarations, the completed signed Application, and the Policy (together with any and all endorsements thereto) shall constitute the entire agreement between the Underwriter and the Insured(s).

**Homeland Insurance Company of New York**
By:

_____                August 1, 2014
Its Authorized Representative                                              Date:

ENDORSEMENT NO. 1
MEDICAL EXPENSES FOR BODILY INJURY ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on August 4, 2014, forms part of:

|  |  |
|---|---|
| Policy No. | LTC-6366-14 |
| Issued to | GI Plum Holdco, LLC |
| Issued by | Homeland Insurance Company of New York |

In consideration of the premium charged:

(1)     Solely with respect to the coverage afforded under INSURING AGREEMENT (B) of this Policy and subject to the terms and conditions set forth in this endorsement, it is understood and agreed that the Underwriter will pay on behalf of the **Insured Medical Expenses** (as defined below) for **Bodily Injury** caused by an accident:

     (a)     on premises owned or rented by the **Named Insured**;

     (b)     on ways adjacent to premises owned or rented by the **Named Insured**; or

     (c)     because of the operations of the **Named Insured**;

provided that:

     (i)     such accident takes place in the coverage territory and during the **Policy Period**;

     (ii)     **Medical Expenses** are incurred and reported to the Underwriter within one year of the date of the accident; and

     (iii)     the injured person submits to examination, as often as required by the Underwriter, by physicians of the Underwriter's choice and at the expense of the Underwriter.

(1)     Solely with respect to the coverage afforded by this endorsement, "**Medical Expenses**" means reasonable payments for:

     (a)     first aid administered at the time of an accident;

     (b)     necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

     (c)     necessary ambulance, hospital, professional medical and nursing, and funeral services.

(3)     In addition to, and not in limitation of, Section III EXCLUSIONS of this Policy, no coverage will be available under this Policy for **Medical Expenses** for **Bodily Injury** sustained by:

     (a)     any **Insured**;

     (b)     any person hired to do work for or on behalf of any **Insured** or tenant of any **Insured**;

     (c)     any person injured on that part of premises owned or rented by the **Named Insured** that the person normally occupies;

(d)     any person, whether or not an **Employee** of any **Insured**, if benefits for such **Bodily Injury** are payable or must be provided under workers' compensation or disability benefits or a similar law; or

(e)     any person injured while engaging in athletic activities.

(4)     The Underwriter's maximum limit of liability for **Medical Expenses** for **Bodily Injury** caused by accidents, as set forth in paragraph (1) of this endorsement, is $5,000 for each person per accident.  Notwithstanding the foregoing, in no event shall the Underwriter's maximum obligation to pay **Medical Expenses** on behalf of the **Insured** exceed $25,000.  Such amounts shall be part of, and not in addition to, the Underwriter's maximum aggregate Limit of Liability for INSURING AGREEMENT (B) of this Policy, as set forth in ITEM 4.B. of the Declarations.

(5)     Notwithstanding anything to the contrary contained in this Policy, no deductible or self-insured retention shall apply to the coverage afforded under this endorsement for **Medical Expenses** for **Bodily Injury** caused by an accident.

(6)     Solely with respect to the coverage afforded under this endorsement, the term "**Loss**," as defined in Section II DEFINITIONS of this Policy, is amended to include **Medical Expenses** for **Bodily Injury** caused by an accident.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 2
SEPARATE LIMITS FOR SCHEDULED NAMED INSUREDS AND POLICY AGGREGATE LIMIT ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on August 4, 2014, forms part of

| | |
|---|---|
| Policy No. | LTC-6366-14 |
| Issued to | GI Plum Holdco, LLC |
| Issued by | Homeland Insurance Company of New York |

In consideration of the premium charged:

(1)     Notwithstanding Section IV GENERAL CONDITIONS (A) and any other provision to the contrary in this Policy, it is understood and agreed that, subject to paragraphs (2), (3) and (4) of this endorsement, the "Each Claim" and "Aggregate for all Claims" Limits of Liability for INSURING AGREEMENTS (A), (B) and (C) of this Policy and the "Fire Damage" Limit of Liability for INSURING AGREEMENT (B) of this Policy, as set forth in ITEM 4 of the Declarations, shall apply:

(a)     separately to each of the following **Named Insureds** (including the natural person **Insureds** thereof):

**Named Insureds** with Separate Limits:

Ash Holdings, LLC dba Redlands Healthcare Center
Birch Holdings, LLC dba University Care Center
Cedar Holdings, LLC dba Highland Palms Healthcare Center
Douglas Fir Holdings, LLC dba Huntington Valley Healthcare
Elm Holdings, LLC dba La Mesa Healthcare Center
Fig Holdings, LLC dba Garden City Healthcare Center
Italian Maple Holdings, LLC dba La Paloma Healthcare Center
Jeffrey Pines Holding, LLC dba Villa Las Palmas Healthcare
Golden Oak Holdings, LLC dba Vasona Creek Healthcare Center
Hawthorne Holdings, LLC dba White Blossom Care Center
KOA Holdings, LLC dba Cottonwood Canyon Healthcare Center
Lilac Holdings, LLC dba Reo Vista Healthcare Center
Applewood Operating Company, LLC dba Copper Ridge Healthcare Center
Magnolia Holdings, LLC dba Oak River Rehab
Norway Maple Holdings, LLC dba Crystal Cove Care Center
Olive Holdings, LLC dba Alviara Rehab
Poplar Holdings, LLC dba Poway Rehab
Quince Holdings, LLC dba Pueblo Springs Rehabilitation Center fka Valley Health Care and Rehabilitation
Spruce Holdings, LLC dba Visalia Nursing and Rehabilitation Center
Tulip Tree Holdings, LLC dba Mt. Olympus Rehabilitation Center fka Wasatch Valley Rehabilitation
Viburnum Holdings, LLC dba Spring Creek Healthcare Center
Green Farm Holdings, LLC
Ulmus Holdings, LLC dba Rock Creek Care Center
Walnut Holdings, LLC dba Desert Blossom Health & Rehabilitation Center
Honeyflower Holdings, LLC dba Arlington Gardens Care Center
Ixia Holdings, LLC dba Bishop Care Center
Kerria Holdings, LLC dba Westview Healthcare Center
Rosebud Holdings, LLC dba Western Slope Health Center
Aloe Holdings, LLC dba Auburn Oaks Care Center
Aster Holdings, LLC dba Four Corners Regional Care Center

Bluebell Holdings, LLC dba Wolf Creek Care Center
Oleander Holdings, LLC dba Sacramento Sub-Acute
Lily Holdings, LLC dba Oakwood Gardens Care Center
Windflower Holdings, LLC dba Rocky Point Care Center
Violet Holdings, LLC dba Lincoln Meadows Care Center
Snowdrop Holdings, LLC dba Linwood Meadows Care Center
Flax Holdings, LLC dba River Valley Care Center
Azalea Holdings, LLC dba McKinley Park Care Center
Edelweiss Holdings, LLC dba Crystal Ridge Care Center
Marjoram Holdings, LLC dba Cypress Ridge Care Center
Petunia Holdings, LLC dba Napa Valley Care Center
Begonia Holdings, LLC dba Parkdale Helath & Rehab
Gladiolus Holdings, LLC dba The Pines at Placerville Healthcare Center
Camellia Holdings, LLC dba Red Cliffs Health & Rehab
Crocus Holdings, LLC dba Roseville Care Center
Daffodil Holdings, LLC dba Sandy Health & Rehab
Jonquil Holdins, LLC dba Davis healthcare Center
Daisy Holdings, LLC dba Pine Creek Care Center
Nightshade Holdings, LLC dba Redwood Cove Healthcare Center
Queen Ann's Lace Holdings, LLC dba Whitney Oaks Care Center
Thyme Holdings, LLC dba Westgate Gardens Care Center
White Fir Holdings, LLC dba Midtown Oaks Post Acute
Pepperbush Holdings, LLC dba San Diego Post-Acute Center

and

(b)     on a shared basis for all other **Insureds**.

(2)     In no event shall the Underwriter's Limit of Liability in connection with any single **Claim** or **Related Claim** exceed the applicable "Each Claim" Limit of Liability set forth in ITEM 4 of the Declarations, regardless of the number of **Insureds** named in such **Claim** or **Related Claim**.

(3)     In no event shall the Underwriter's Limit of Liability for all **Property Damage** resulting from any single fire caused by the **Insured's** negligence and occurring on premises rented by the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises exceed the applicable "Fire Damage" Limit of Liability set forth in ITEM 4.B. of the Declarations, regardless of the number of **Insureds** renting or occupying such premises or the number of **Insureds** named in any **Claim** in connection with such fire.

(4)     The Underwriter's "Maximum Aggregate Policy Limit of Liability" shall be $25,000,000.  This amount shall be the Underwriter's maximum aggregate Limit of Liability for all **Loss** resulting from all **Claims** and **Related Claims** for which coverage is provided under INSURING AGREEMENTS (A), (B) and (C) of this Policy.  After the Underwriter's "Maximum Aggregate Policy Limit of Liability" has been exhausted by the payment of **Loss**, the premium will be fully earned, all obligations of the Underwriter under INSURING AGREEMENTS (A), (B) and (C) of this Policy will be completely fulfilled and exhausted, including any obligation to pay **Defense Expenses** or to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under such INSURING AGREEMENTS.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 3
COVERAGE ENHANCEMENTS ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on August 4, 2014, forms part of:

|   |   |
|---|---|
| Policy No. | LTC-6366-14 |
| Issued to | GI Plum Holdco, LLC |
| Issued by | Homeland Insurance Company of New York |

In consideration of the premium charged:

A.     MEDICAL ADVERTISING WRONGFUL ACT SUBLIMIT

(1)     The Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for a **Medical Advertising Wrongful Act** (as defined below) shall be $100,000, and the Underwriter's maximum aggregate Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for **Medical Advertising Wrongful Acts** shall be $100,000, which amounts shall be part of, and not in addition to, the "Aggregate for all Claims" Limit of Liability stated in ITEM 4.A. of the Declarations.

(2)     Section II DEFINITIONS of this Policy is amended to include the following term:

> "**Medical Advertising Wrongful Act**" means any actual or alleged false, incorrect or misleading publication by the **Named Insured** concerning the type, scope or quality of **Medical Services** offered by the **Named Insured**.

(3)     The term "**Professional Services Wrongful Act**," as defined in Section II DEFINITIONS of this Policy, is amended to include any **Medical Advertising Wrongful Act**.

B.     HIPAA VIOLATION REIMBURSEMENT COVERAGE

(1)     In addition to the coverage afforded under INSURING AGREEMENTS (A), (B), (C), (D) and (E) of this Policy, upon satisfactory proof of payment by the **Named Insured**, the Underwriter will reimburse the **Named Insured**, up to the Limit of Liability set forth in paragraph B.(4) below, for **HIPAA Fines and Penalties** actually paid by the **Named Insured** resulting from a **HIPAA Violation** that occurs during the **Policy Period**.

(2)     Section II DEFINITIONS of this Policy is amended to include the following terms:

> "**HIPAA Fines and Penalties**" means any fines and/or penalties imposed upon an **Insured** under Title II of the Health Insurance Portability and Accountability Act.

> "**HIPAA Violation**" means any violation by an **Insured** of Title II of the Health Insurance Portability and Accountability Act.

(3)     Solely with respect to the coverage afforded under paragraph B.(1) above, clause (3) of the term "**Loss**," as defined in Section II DEFINITIONS of this Policy, is amended to read in its entirety as follows:

(3)     fines, penalties, sanctions, fees, government payments or taxes, except **HIPAA Fines and Penalties**;

(4)     The Underwriter's maximum aggregate Limit of Liability for all **HIPAA Fines and Penalties** resulting from all **HIPAA Violations** reimbursed under paragraph B.(1) above shall be $25,000. Payment of such maximum aggregate Limit of Liability shall terminate the Underwriter's obligation to reimburse any further **HIPAA Fines and Penalties** under this Policy.

(5)     If, during the **Policy Period**, a **HIPAA Violation** occurs, as a condition precedent to its right to reimbursement under paragraph B.(1) above, the **Named Insured** shall give the Underwriter written notice of such **HIPAA Violation** as soon as practicable thereafter, but in no event later than thirty (30) days after the Expiration Date or earlier cancellation date of this Policy.

C.     SEPARATE LIMIT FOR ADMINISTRATORS

(1)     Solely with respect to the coverage afforded under paragraph C. "SEPARATE LIMIT FOR ADMINISTRATORS" of this endorsement, Section I INSURING AGREEMENTS (A) of this Policy is amended to read in its entirety as follows:

**(A)     Claims-Made Professional Liability Insurance:**

(1)     The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.A.1. of the Declarations on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

(2)     In the event the Underwriter's Limits of Liability stated in ITEM 4.A.1. of the Declarations have been exhausted by the payment of **Loss**, the Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.A.2. of the Declarations on behalf of any employed administrator of the **Named Insured** (each, an "**Administrator**") any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** first made against such **Administrator** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Administrator** during the **Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

(2)     It is understood and agreed that no coverage will be available under INSURING AGREEMENT (A)(2) of this Policy (as set forth in paragraph C.(1) above) unless and until the Limits of Liability applicable to INSURING AGREEMENT (A)(1) of this Policy (as set forth in paragraph C.(1) above) as stated in ITEM 4.A.1. of the Declarations, as amended

in paragraph C.(3) below, have been completely exhausted by the payment of **Loss** (including any payment made on behalf of any **Administrator**).  Accordingly, the Limits of Liability stated in ITEM 4.A.2. of the Declarations, as amended in paragraph C.(3) below, shall not be available to any **Administrator** under any circumstance unless and until the Underwriter's Limits of Liability stated in ITEM 4.A.1. of the Declarations have been completely exhausted by the payment of **Loss.**

(3)  Solely with respect to the coverage afforded under paragraph C. "SEPARATE LIMIT FOR ADMINISTRATORS" of this endorsement, ITEM 4.A. of the Declarations is amended to read in its entirety as follows:

| | | |
|---|---|---|
| A.1. | Healthcare Professional Liability | |
| | Each Claim………………………………………….. | $1,000,000 |
| | Aggregate for all Claims…………………………………. | $3,000,000 |
| | Deductible X        Self-Insured Retention | |
| | Per Claim……………………………………….. | $250,000 |
| | Aggregate……………………………………….. | $5,000,000 |
| | | |
| A.2. | Employed Administrators Professional Liability | |
| | Each Claim………………………………………….. | $100,000 |
| | Aggregate for all Claims…………………………………. | $100,000 |
| | Deductible ☐        Self-Insured Retention ☒ | |
| | Per Claim……………………………………….. | $0 |
| | Aggregate……………………………………….. | N/A |

(4)  Solely with respect to the coverage afforded under paragraph C. "SEPARATE LIMIT FOR ADMINISTRATORS" of this endorsement and notwithstanding anything to the contrary in this Policy, the Limits of Liability stated in ITEM 4.A.2. of the Declarations, as amended in paragraph C.(3) above, shall apply separately to each **Administrator** and such Limits of Liability shall be in addition to the Limits of Liability stated in ITEM 4.A.1. of the Declarations, as amended in paragraph C.(3) above.

(5)  Section IV GENERAL CONDITIONS (A) of this Policy shall be deemed amended to the extent necessary to effect the purpose and intent of paragraph C. "SEPARATE LIMIT FOR ADMINISTRATORS" of this endorsement.


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  4
ADDITIONAL INSURED MORTGAGEE, LANDLORD OR LESSOR ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on August 4, 2014, forms part of:

| | |
|---|---|
| Policy No. | LTC-6366-14 |
| Issued to | GI Plum Holdco, LLC |
| Issued by | Homeland Insurance Company of New York |

In consideration of the premium charged:

(1)     Solely for the purposes of the coverage afforded under INSURING AGREEMENT (B) of this Policy, the term "**Insured**," as defined in Section II DEFINITIONS of this Policy, shall be deemed to include any mortgagee, landlord or lessor of leased equipment that the **Named Insured** is required by written contract to name as an insured under this Policy (each an "Additional Insured"), but only with respect to liability of any such Additional Insured that is based on or arises out of the maintenance, operation or use by the **Named Insured** of the applicable premises and/or leased equipment.

(2)     Notwithstanding paragraph (1) above, no coverage will be available under this Policy for any:

   (a)     **Occurrence** which takes place after the **Named Insured** ceases to be a tenant in the applicable premises or a mortgagor under the applicable mortgage; or

   (b)     **Claim** based on or arising out of :

      (i)     any structural alterations, new construction or demolition operations performed by or on behalf of an Additional Insured; or

      (ii)    the terms, conditions or limitations of any such mortgage, or the failure by the **Named Insured** to pay all or any part, or to otherwise perform any obligations under the terms and conditions, of any mortgage loan.

All other terms, conditions and limitations of this Policy shall remain unchanged.

HPE-00017-07/08

ENDORSEMENT NO. 5
AMEND CLAIMS MADE TRIGGER AT RENEWAL ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on August 4, 2014, forms part of:

      Policy No.     LTC-6366-14
      Issued to      GI Plum Holdco, LLC
      Issued by     Homeland Insurance Company of New York

In consideration of the premium charged, in the event that this Policy is renewed by the Underwriter:

(1)     The italicized introductory language at the top of page 1 of this Policy is amended to read in its entirety as follows:

        ***PORTIONS OF THIS POLICY APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD.  PLEASE READ THIS POLICY CAREFULLY.***

(2)     The first sentence of Section IV (C) (1) of this Policy is amended to read in its entirety as follows:

     (1)     If, during the **Policy Period** or any Extended Reporting Period**,** any **Claim** for a **Wrongful Act** or **Occurrence** under INSURING AGREEMENT (A), (B) or (C) is first made against an **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such **Claim** as soon as practicable thereafter, but in no event later than the expiration of any applicable Extended Reporting Period.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 6
AMOUNTS PAID WITHIN DEDUCTIBLE WILL NOT REDUCE LIMIT ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on August 4, 2014, forms part of:

Policy No.      LTC-6366-14
Issued to       GI Plum Holdco, LLC
Issued by       Homeland Insurance Company of New York

In consideration of the premium charged:

(1)     Section IV GENERAL CONDITIONS (A)(7)(b) of this Policy is amended to   read in its
        entirety as follows:

                (b)     If a "Deductible" is selected under any Insuring Agreement in ITEM 4 of
                        the Declarations, any amounts paid within such deductible will not
                        reduce the applicable Limits of Liability for such Insuring Agreement.


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 7
ADDITIONAL INSURED ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on August 4, 2014, forms part of

Policy No.      LTC-6366-14
Issued to       GI Plum Holdco, LLC
Issued by       Homeland Insurance Company of New York

In consideration of the premium charged:

(1)     Subject to paragraph (2) below, the term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the person(s) or entity(ies) listed below (each an "Additional Insured").

        Additional Insured(s)

Sharol MacKie, with respects to her duties as a Nurse Practitioner, solely while acting on behalf of the Named Insured and solely within the scope of her duties as such

Dinesh Mantri, MD, solely while acting on behalf of the named insured and solely within the scope of his administrative duties as such, including the overseeing of Nurse Practitioner, Sharol MacKie

Inland Counties Regional Center, Inc.

SCAN Health Plan c/o Ebix BPO, Inc.

Rawlins Family Trust
100 San Marino Avenue
San Marino, CA 91108

The Mellman Family Trust
c/o Wells Fargo Bank, NA
Wealth Custom Trailing Documents
MAC#D4003-01E
801 W. 4th Street
Winston Salem, NC 27101-2501

Auburn Manor Holding Corporation

Martin A. Harmon, Trustee of the Crosswinds Trust, est 8/6/92

Allpro, Inc.

Veterans Health Administration

Foremost Healthcare Properties, Inc.

Horizon West Healthcare of California fka Sierra Medical Enterprises

HPE-20001-03-09                              1

Florine E. Wyatt, Trustee of the Wyatt 1992 Living Trust

Westgate Convalescent Hospital Center

The MLG Trust

(2)     It is understood and agreed that the Additional Insured(s) listed above is/are being afforded coverage under this Policy for any liability incurred *solely* as a result of the acts, errors or omissions of the original **Insured**.  No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** against an Additional Insured based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error or omission of an Additional Insured.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Ex. A, Page 29 of 78

ENDORSEMENT NO. 8
BLANKET WAIVER OF SUBROGATION ENDORSEMENT – INSURING AGREEMENT (B) ONLY

This Endorsement, which is effective at 12:01 a.m. on August 4, 2014, forms part of:

| | |
|---|---|
| Policy No. | LTC-6366-14 |
| Issued to | GI Plum Holdco, LLC |
| Issued by | Homeland Insurance Company of New York |

In consideration of the premium charged, solely with respect to any payment made under INSURING AGREEMENT (B) of this Policy, the Underwriter agrees to waive its right to subrogation under Section IV GENERAL CONDITIONS (K) of this Policy.  Section IV GENERAL CONDITIONS (K) of this Policy shall be deemed amended to the extent necessary to affect the purpose and intent of this endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Ex. A, Page 30 of 78

ENDORSEMENT NO.  9
ADDITIONAL INSURED ENDORSEMENT – GL ONLY

This Endorsement, which is effective at 12:01 a.m. on August 4, 2014, forms part of:

| | |
|---|---|
| Policy No. | LTC-6366-14 |
| Issued to | GI Plum Holdco, LLC |
| Issued by | Homeland Insurance Company of New York |

In consideration of the premium charged:

(1)     Subject to paragraph (2) below, the term "**Insured**", as defined in Section II DEFINITIONS of this Policy, shall be deemed to include the person(s) or entity(ies) listed below (each an "Additional Insured"), but only with respect to **Claims** under INSURING AGREEMENT (B) of this Policy.  No coverage will be available to any such Additional Insured under INSURING AGREEMENT (A) or (C) of this Policy.

**Additional Insured(s)**

Clark County Nevada
Holder / Loan Number: 602082-10

General Electric Capital Corporation ISAOA & GE Business Financial Services, Inc.

State of Arizona; Department of Economic Security

Calvary Baptist Church of Los Gatos, Inc.; Calvary Church with respects to leased parking lot

Sweet Water River Church with respects to leased parking lot

Seacoast Community Church with respects to leased parking lot

Mandalay Bay, its parent, subsidiaries, and affiliates as Additional Insured Mandalay Bay Resort and Casino
Attn:  Jennifer Specter
3950 Las Vegas Boulevard South
Las Vegas, NV 89119

Outdoor Facility Reservations, City of San Marcos

The County of El Dorado, its officers, officials, employees and volunteers.

City of Visalia, California Department of Transportation
110 W. Main Street, Suite D
Visalia, CA 93291

The State of Arizona and the Department of Economic Security

Yolo County Mental Health Department

(2)     It is understood and agreed that the Additional Insured(s) listed above is/are being afforded coverage under this Policy for any liability incurred *solely* as a result of the acts, errors or omissions of the original **Insured**.  No coverage will be available under this Policy for any **Claim** based on or arising out of any actual or alleged independent or direct liability of any Additional Insured.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 10
AMEND SECTION III EXCLUSION (B)(4) ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on August 4, 2014, forms part of

Policy No.      LTC-6366-14
Issued to       GI Plum Holdco, LLC
Issued by       Homeland Insurance Company of New York

In consideration of the premium charged:

(1)     In the event of a **Claim** for any actual or alleged **Elder Abuse**, as such term is defined in paragraph (2) below, it is understood and agreed that Section III EXCLUSIONS (B)(4) of this Policy shall not apply to:

    (a)     any **Insured** who did not personally participate in such **Elder Abuse**; or

    (b)     the vicarious liability of the **Named Insured** for such **Elder Abuse**.

(2)     For purposes of this endorsement, the term "**Elder Abuse**" means a single or repeated act, or lack of appropriate action, occurring within any relationship where there is an expectation of trust which causes harm or distress to an older person.


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  11
SCHEDULE A - NAMED INSURED ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on August 4, 2014, forms part of:

Policy No.        LTC-6366-14
Issued to         GI Plum Holdco, LLC
Issued by Homeland Insurance Company of New York

In consideration of the premium charged, the term "**Named Insured**," as defined in Section II DEFINITIONS of this Policy, shall include the entity(ies) scheduled below.  With respect to such entity(ies), the applicable **Retroactive Date** shall be the Retroactive Date set forth opposite the name of each such entity, and ITEM 3 of the Declarations shall be deemed amended accordingly.

| Named Insured | Retroactive Date |
| --- | --- |
| Ash Holdings, LLC dba Redlands Healthcare Center | June 1, 2003 |
| Birch Holdings, LLC dba University Care Center | June 1, 2003 |
| Cedar Holdings, LLC dba Highland Palms Healthcare Center | June 1, 2003 |
| Douglas Fir Holdings, LLC dba Huntington Valley Healthcare | June 1, 2003 |
| Elm Holdings, LLC dba La Mesa Healthcare Center | June 1, 2003 |
| Fig Holdings, LLC dba Garden City Healthcare Healthcare Center | June 1, 2003 |
| Italian Maple Holdings, LLC dba La Paloma Healthcare Center | June 1, 2003 |
| Jeffrey Pines Holding, LLC dba Villa Las Palmas Healthcare | June 1, 2003 |
| Golden Oak Holdings, LLC dba Vasona Creek Healthcare Center | June 1, 2003 |
| Hawthorne Holdings, LLC dba White Blossom Care Center | June 1, 2003 |
| KOA Holdings, LLC dba Cottonwood Canyon Healthcare Center | March 1, 2006 |

Ex. A, Page 34 of 78

| | |
|---|---|
| Lilac Holdings, LLC dba Reo Vista Healthcare Center | January 18, 2007 |
| Applewood Operating Company LLC dba Copper Ridge Healthcare Center | January 3, 2007 |
| Magnolia Holdings, LLC dba Oak River Rehab | January 18, 2007 |
| Norway Maple Holdings, LLC dba Crystal Cove Care Center | September 18, 2007 |
| Olive Holdings, LLC dba Aviara Health Care Center | April 16, 2008 |
| Poplar Holdings, LLC dba Poway Healthcare Center | April 16, 2008 |
| Quince Holdings, LLC dba Pueblo Springs Rehabilitation Center | October 30, 2009 |
| Spruce Holdings, LLC dba Visalia Nursing and Rehabilitation Center | June 16, 2009 |
| Tulip Tree Holdings, LLC dba Mt. Olympus Rehabilitation Center | October 30, 2009 |
| Viburnum Holdings, LLC dba Spring Creek Healthcare Center | September 1, 2009 |
| Green Farm Holdings, LLC | March 17, 2009 |
| Honeyflower Holdings, LLC dba Arlington Gardens Care Center | June 9, 2010 |
| Ixia Holdings, LLC dba Bishop Care Center | June 7, 2011 |
| Kerria Holdings, LLC dba Westview Healthcare Center | June 7, 2011 |

| | |
|---|---|
| Rosebud Holdings, LLC dba Western Slope Healthcare Center | June 7, 2011 |
| Aloe Holdings, LLC dba Auburn Oaks Care Center | June 7, 2011 |
| Aster Holdings, LLC dba Four Corners Regional Care Center | June 7, 2011 |
| Bluebell Holdings, LLC dba Wolf Creek Care Center | June 7, 2011 |
| Oleander Holdings, LLC dba Sacramento Sub-Acute | June 7, 2011 |
| Lily Holdings, LLC dba Oakwood Gardens Care Center | June 7, 2011 |
| Windflower Holdings, LLC dba Rocky Point Care Center | June 7, 2011 |
| Violet Holdings, LLC dba Lincoln Meadows Care Center | June 7, 2011 |
| Snowdrop Holdings, LLC dba Linwood Meadows Care Center | June 7, 2011 |
| Flax Holdings, LLC dba River Valley Care Center | June 7, 2011 |
| Azalea Holdings, LLC dba McKinley Park Care Center | June 7, 2011 |
| Edelweiss Holdings, LLC dba Crystal Ridge Care Center | June 7, 2011 |
| Marjoram Holdings, LLC dba Cypress Ridge Care Center | June 7, 2011 |
| Petunia Holdings, LLC dba Napa Valley Care Center | June 7, 2011 |
| Begonia Holdings, LLC dba Parkdale Health & Rehab | June 7, 2011 |
| Gladiolus Holdings, LLC dba The Pines at Placerville Healthcare Center | June 7, 2011 |
| Camellia Holdings, LLC dba Red Cliffs Health & Rehab | June 7, 2011 |

| | |
|---|---|
| Crocus Holdings, LLC dba Roseville Care Center | June 7, 2011 |
| Daffodil Holdings, LLC dba Sandy Health & Rehab | June 7, 2011 |
| Jonquil Holdings, LLC dba Davis Healthcare Center | June 7, 2011 |
| Daisy Holdings, LLC dba Pine Creek Care Center | June 7, 2011 |
| Nightshade Holdings, LLC Redwood Cove Healthcare Center | June 7, 2011 |
| Queen Ann's Lace Holdings, LLC dba Whitney Oaks Care Center | June 7, 2011 |
| Thyme Holdings, LLC dba Westgate Gardens Care Center | June 7, 2011 |
| Ulmus Holdings, LLC dba Rock Creek Care Center | December 1, 2010 |
| Walnut Holdings, LLC dba Desert Blossom Health & Rehabilitation Center | January 1, 2011 |
| White Fir Holdings, LLC dba Midtown Oaks Post Acute | December 27, 2013 |

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  12
NOTICE OF CANCELLATION TO SCHEDULED PARTY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on August 4, 2014, forms part of

Policy No.      LTC-6366-14
Issued to       GI Plum Holdco, LLC
Issued by       Homeland Insurance Company of New York

In consideration of the premium charged:

(1)     If the Underwriter cancels this Policy for any reason other than non-payment of premium, the
        Underwriter will endeavor to provide notice of such cancellation to the individual(s) or entity(ies)
        identified in the schedule below (each a "Scheduled Party"), at the address set forth next to the
        Scheduled Party's name, when notice of cancellation is sent to the **First Named Insured**.  In no
        event will the timing of notice to a Scheduled Party exceed the timing of notice to the **First
        Named Insured**.  It is understood and agreed that notice of cancellation to a Scheduled Party is
        provided solely as a courtesy for the convenience of the **First Named Insured** and does not
        constitute a prerequisite to effective policy cancellation.

(2)     Failure to provide notice of cancellation to a Scheduled Party shall impose no liability of any kind
        or nature whatsoever on the Underwriter and shall not amend or extend the effective date of
        policy cancellation or invalidate the cancellation.

        Scheduled Party:

| |
|---|
| General Electric Capital Corp ISAOA & GE Business Financial Services, Inc.; GEMSA Loan Services, LP |
| Banc of California National Association c/o Kurt Kesler & Associates Insurance Services, Inc. |

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO. 13
LIMIT COVERAGE TO GENERAL LIABILITY ONLY FOR SPECIFIC INSURED LOCATION(S) ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on August 4, 2014, forms part of

      Policy No.     LTC-6366-14
      Issued to      GI Plum Holdco, LLC
      Issued by     Homeland Insurance Company of New York

In consideration of the premium charged, solely with respect to the **Insured's** location(s) identified below, this Policy shall provide coverage solely for **Claims** under INSURING AGREEMENT (B) of this Policy.

> Location(s) with GL-Only Coverage:

> 100 E San Marcos Blvd Ste 150
> San Marcos, CA 92069-2987
>
> 5252 Auburn Blvd
> Sacramento, CA 95841

No coverage will be available under INSURING AGREEMENT (A), (C), (D) or (E) of this Policy with respect to any location(s) identified above.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 14
FRONT LOSS WITHIN DEDUCTIBLE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on August 4, 2014, forms part of:

| | |
|---|---|
| Policy No. | LTC-6366-14 |
| Issued to | GI Plum Holdco, LLC |
| Issued by | Homeland Insurance Company of New York |

In consideration of the premium charged, in accordance with Section IV GENERAL CONDITIONS (A)(7)(a) of this Policy, the Underwriter has agreed to pay **Loss** within the applicable deductible on behalf of the **Insured**; provided, that the **Insured** understands and agrees that he/she/it shall repay the Underwriter any amounts so paid as soon as practicable upon demand of the Underwriter.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  15
ADDITIONAL NAMED INSURED – RELATED TO ORIGINAL NAMED INSURED ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on August 4, 2014, forms part of

| | |
|---|---|
| Policy No. | LTC-6366-14 |
| Issued to | GI Plum Holdco, LLC |
| Issued by | Homeland Insurance Company of New York |

In consideration of the premium charged:

(1)     The term "**Named Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the entity(ies) scheduled below (each an "Additional Named Insured"), but solely:

   (a)     with respect to liability imposed or sought to be imposed on such Additional Named Insured that is based on or arises out of acts, errors or omissions committed or allegedly committed by such Additional Named Insured when and to the extent that, such Additional Named Insured is acting on behalf of, and within the capacity and scope of its duties for GI Plum Holdco, LLC;  and

   (b)     for **Wrongful Acts** or **Occurrences** happening on or after the Retroactive Date identified for each Additional Named Insured in the schedule below:

        <u>SCHEDULE</u>

<u>Additional Named Insured: </u>                               <u>Retroactive Date:</u>

| Additional Named Insured: | Retroactive Date: |
|---|---|
| 1990 Fruitdale Avenue, LLC | 06.01.2003 |
| 16412 Los Gatos Blvd., LLC | 06.01.2003 |
| 1310 West Granger Avenue, LLC | 06.01.2003 |
| 1391 Madison Avenue, LLC | 06.11.2007 |
| 6061 Banbury Street, LLC | 06.11.2007 |
| 944 Regal Road, LLC | 06.11.2007 |
| 3300 Franklin Street, LLC | 03.17.2009 |
| 15632 Pomerado Road, LLC | 06.11.2007 |
| 201 Hartnell Avenue, LLC | 03.17.2009 |
| 5545 East Lee Street, LLC | 03.17.2009 |
| 1925 East Houston Avenue, LLC | 06.09.2010 |
| 2200 East 330 South, LLC | 06.09.2010 |
| 260 Racetrack Street, LLC | 06.09.2010 |

HPE-00062-04-11                          1

| | |
|---|---|
| 60 South 58th Street, LLC | 12.01.2010 |
| Plum Healthcare Group North, LLC | 01.01.2011 |
| Plum Healthcare Group, LLC | 06.07.2011 |
| Bay Bridge Capital Partners, LLC | 06.01.2003 |
| GI Side Fund Plum Corp. | 11.15.2012 |
| Flower Farm Group, LLC | 11.15.2012 |
| Plum Propco, LLC | 11.15.2012 |
| Plum OpCo Holdings, LLC | 11.15.2012 |
| 1139 Cirby Way, LLC | 11.15.2012 |
| 3400 Bell Road, LLC | 11.15.2012 |
| 818 N. 400 West, LLC | 11.15.2012 |
| 3700 H Street, LLC | 11.15.2012 |
| 250 E. 600 North, LLC | 11.15.2012 |
| 107 Catherin Lane, LLC | 11.15.2012 |
| 1745 E. 280 North, LLC | 11.15.2012 |
| 1161 Cirby Way, LLC | 11.15.2012 |
| 50 E 9000 South, LLC | 11.15.2012 |
| 396 Dorsey Drive, LLC | 11.15.2012 |
| 9000 Larkin Road, LLC | 11.15.2012 |
| 1040 Marshall Way, LLC | 11.15.2012 |
| 3688 Nye Avenue, LLC | 11.15.2012 |
| 151 Pioneer Avenue, LLC | 11.15.2012 |
| 715 Pole Line Road, LLC | 11.15.2012 |
| 12225 Shale Ridge Road, LLC | 11.15.2012 |
| 3510 East Shields Road, LLC | 11.15.2012 |
| 1501 Skyline Drive, LLC | 11.15.2012 |

| | |
|---|---|
| 1162 South Dora, LLC | 11.15.2012 |
| 5255 Hemlock Street, LLC | 11.15.2012 |
| 3275 Villa Lane, LLC | 11.15.2012 |
| 3280 Washington Street, LLC | 11.15.2012 |
| 1550 3rd Street, LLC | 11.15.2012 |
| 625 16th Street, LLC | 11.15.2012 |
| Blueblosson Holdings, LLC | 08.30.2013 |
| Corktree Holdings, LLC | 08.27.2013 |
| Pepperbush Holdings, LLC | 09.04.2013 |
| Winterhazel Holdings, LLC | 09.04.2013 |
| Yate Holdings, LLC | 06.18.2013 |
| West Post Drive, LLC | 06.18.2013 |
| 2600 L Street, LLC | 08.15.2013 |
| Acophy Holdings, LLC | 07.19.2013 |

(2)     It is understood and agreed that the Additional Named Insured(s) share in the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

(3)     ITEM 3 of the Declarations shall be deemed amended to the extent necessary to effect the purpose and intent of this endorsement.

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO. 16
MAINTENANCE DEDUCTIBLE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on August 4, 2014, forms part of:

Policy No.       LTC-6366-14
Issued to        GI Plum Holdco, LLC
Issued by        Homeland Insurance Company of New York

In consideration of the premium charged, it is understood and agreed that:

(1)     With respect to any **Claim**:

    (a)     pending as of the **Threshold Date** (as defined below) for which no payment has been made by the Underwriter or the **Insured** within the applicable deductible stated in ITEM 4 of the Declarations in connection with such **Claim**; or

    (b)     made against the **Insured** after the **Threshold Date**,

    the Underwriter's obligation to pay **Loss** or **Defense Expenses** under this Policy in connection with any such **Claim** shall be excess of a deductible of $10,000 per each such **Claim**.

(2)     The deductible stated in paragraph (1) above shall be eroded (or exhausted) by the payment of **Loss** or **Defense Expenses**.  The **Insured** shall be responsible for payment in full of such deductible; provided, that the Underwriter has agreed to pay such deductible on behalf of the **Insured** and the **Insured** understands and agrees that he/she/it shall repay the Underwriter any amounts so paid as soon as practicable upon demand of the Underwriter.  Any amounts paid within such deductible will reduce, and may exhaust, the applicable Limits of Liability stated in ITEM 4 of the Declarations.

(3)     For the purposes of this endorsement, the term "**Threshold Date**" means the date on which the full amount of the applicable aggregate deductible stated in ITEM 4 of the Declarations has been paid by the Underwriter and/or the **Insured**.

(4)     This Policy shall be deemed amended to extent necessary to effect the purpose and intent of this endorsement.


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  17
ADDITIONAL INSURED ENDORSEMENT-PRIMARY AND NONCONTRIBUTORY (GL)

This Endorsement, effective at 12:01 a.m. on August 4, 2014, forms part of

Policy No.      LTC-6366-14
Issued to       GI Plum Holdco, LLC
Issued by       Homeland Insurance Company of New York

In consideration of the premium charged:

(1)     Solely for the purposes of the coverage afforded under INSURING AGREEMENT (B) of this Policy, the term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the person(s) or entity(ies) scheduled below (each an "Additional Insured"), but solely with respect to any liability imposed or sought to be imposed on such Additional Insured as a result of the acts, errors or omission of an original **Insured**.

(2)     No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** against an Additional Insured based solely upon the actual or alleged acts, errors or omissions of an Additional Insured.

(3)     With respect to any **Claim** against an Additional Insured based upon both the acts, errors or omissions of the original **Insured** and the acts, errors or omissions of an Additional Insured, the Underwriter will pay **Defense Expenses** incurred by such Additional Insured in connection with such **Claim** and **Loss** such Additional Insured is legally obligated to pay as a result of the acts, errors or omissions of the original **Insured**, subject in all events to all other terms, conditions and exclusions of this Policy. No coverage will be available under this Policy for any **Loss** such Additional Insured is obligated to pay as a result of its own acts, errors or omissions.

(4)     Any coverage for **Defense Expenses** incurred by an Additional Insured pursuant to this endorsement shall be primary, and Section IV GENERAL CONDITIONS (L) of this Policy shall be deemed amended accordingly.

(5)     If a written agreement between the **Named Insured** and an Additional Insured providing indemnity or contribution in favor of such Additional Insured exists, the amount, extent and scope of coverage available under this Policy to such Additional Insured will be no greater than the amount, extent and scope of indemnification available to such Additional Insured as agreed to by the **Named Insured** in such agreement.

(6)     It is understood and agreed that the Additional Insured(s) scheduled below share in the applicable Limits of Liability set forth in ITEM 4.B. of the Declarations.

Ex. A, Page 45 of 78

<u>SCHEDULE</u>

<u>Additional Insured</u>

County of Santa Clara
and members of the Board of Supervisors of the County of Santa Clara, and the officers, agents, and employees of the County of Santa Clara, individually and collectively, as additional insureds.


County of Placer

All other terms, conditions and limitations of this Policy shall remain unchanged.

HPE-20039-12-10                              2

**LONG TERM CARE
ORGANIZATIONS PROFESSIONAL
LIABILITY, GENERAL LIABILITY
AND EMPLOYEE BENEFIT
LIABILITY POLICY, INCLUDING
LEGAL/ MEDIA AND
EVACUATION EXPENSE
REIMBURSEMENT**



*PORTIONS OF THIS POLICY APPLY ONLY TO CLAIMS FIRST MADE AGAINST
THE INSURED AND REPORTED TO THE UNDERWRITER DURING THE
POLICY PERIOD.  PLEASE READ THIS POLICY CAREFULLY.*

In consideration of the payment of the premium, and in reliance on all statements made and
information furnished to the Underwriter, and subject to all of the terms and conditions of this
Policy (including all endorsements hereto), the Underwriter and the **Insured** agree as follows:

**I.    INSURING AGREEMENTS**

**(A)    Claims Made Professional Liability Insurance:**

The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.A. of the
Declarations on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay
as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on
or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured**
during the **Policy Period** or applicable Extended Reporting Period and reported to the
Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

**(B)    Claims Made General Liability Insurance:**

The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.B. of the
Declarations on behalf of the **Insured** any **Loss** which the **Insured** is legally obligated to
pay as a result of a covered **Claim** alleging **Bodily Injury**, **Property Damage**, **Advertising
Injury** or **Personal Injury** that is caused by an **Occurrence** happening on or after the
**Retroactive Date**;  provided, that the **Claim** is first made against the **Insured** during the
**Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in
accordance with GENERAL CONDITION (C) of this Policy.

**(C)    Claims Made Employee Benefit Liability Insurance:**

The Underwriter will pay up to the Limit of Liability shown in ITEM 4.C. of the
Declarations on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay
as a result of any covered **Claim** for an **Employee Benefit Wrongful Act** happening on or
after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured**

HPF-20002-03-09                            1

during the **Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

**(D)    Evacuation Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the Underwriter will reimburse the **Named Insured** up to the amount set forth in ITEM 4.D. of the Declarations for **Evacuation Expense** actually paid by the **Named Insured** during the **Policy Period** in connection with an **Evacuation** occurring after the **Retroactive Date**.

**(E)    Legal/ Media Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the Underwriter will reimburse the **Named Insured** up to the amount set forth in ITEM 4.E. of the Declarations for **Legal/ Media Expense** actually paid by the **Named Insured** during the **Policy Period** in connection with a **Legal Event** occurring after the **Retroactive Date,** provided, that the Underwriter will have no liability whatsoever for fines, penalties, assessments of costs or other financial awards associated with any such **Legal Event**.

**(F)    Defense and Supplementary Payments:**

The Underwriter has the right and duty to defend any **Claim** that is covered by INSURING AGREEMENTS (A), (B), and (C) of this Policy, even if any of the allegations of such **Claim** are groundless, false or fraudulent.  In addition to the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C), the Underwriter will pay **Defense Expenses** and will:

(1)    pay the premium on any bond to release attachments for an amount not in excess of the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C) of this Policy and the premium on any appeal bond required in any defended suit, provided, that the Underwriter will not be obligated to apply for or furnish any such bond;

(2)    pay all costs imposed against the **Insured** in any such suit;

(3)    provide a legal defense and pay **Defense Expenses** for any arbitration, mediation or other alternative dispute proceeding if:

(a)    the dispute at issue is a **Claim** covered by this Policy, and

(b)    the **Insured** provides notice of the proceeding as required by GENERAL CONDITION (C) of this Policy; and

(4)    pay reasonable expenses, plus loss of earnings due to time off from work, incurred by an **Insured** as a result of being a defendant or co-defendant in a **Claim** or at the Underwriter's request, but not to exceed:

(a)    $500 per day per **Insured**; and

(b)   $12,500 per **Claim**.

## II.   DEFINITIONS

(A)   "**Administration**" means:

    (1)   giving advice or counsel to **Employees** or their beneficiaries concerning their rights or interest with respect to **Employee Benefit Programs**;

    (2)   determining the eligibility of **Employees** to participate in **Employee Benefit Programs**;

    (3)   interpreting the provisions of **Employee Benefit Programs**;

    (4)   handling and keeping records and processing of claims in connection with **Employee Benefit Programs**; and

    (5)   effecting enrollment, termination or cancellation of **Employees** under **Employee Benefit Programs**.

(B)   "**Advertisement**" means a notice that is broadcast or published to the general public or specific market segments about the **Insured's** goods, products or services, for the purpose of attracting customers or supporters. For purposes of this Definition:

    (1)   notice that is broadcast or published includes material placed on the Internet or similar means of electronic communication; and

    (2)   with regard to websites, only that part of a website that is about the **Insured's** goods, products or services, for the purpose of attracting customers or supporters, will be considered an **Advertisement**.

(C)   "**Advertising Injury**" means injury arising out of one or more of the following offenses:

    (1)   the **Insured's** use of another's advertising idea in an **Advertisement**;

    (2)   the **Insured's** use of another's copyright, trade dress or slogan in an **Advertisement**; or

    (3)   the **Insured's** infringement upon another's copyright, trade dress or slogan in an **Advertisement**.

(D)   **"Beauticians and Barbers Professional Services"** means those services rendered by licensed beauticians and/ or barbers in their capacity as such.

(E)   **"Beauticians and Barbers Professional Services Wrongful Act**" means any actual or alleged act, error or omission, or series of acts, errors or omissions, by a licensed beautician or barber, who is not an employee of the **Named Insured** but who is invited by the **Named Insured** onto the **Named Insured's** premises to perform **Beauticians and**

**Barbers Professional Services**, in rendering, or failing to render, such **Beauticians and Barbers Professional Services**.

(F)     "**Bodily Injury**" means bodily injury, sickness or disease sustained by a person, other than a **Patient**, including death resulting from any of these at any time; mental anguish; and mental injury.

(G)     "**Claim**" means any written notice received by an **Insured** that any person or entity intends to hold an **Insured** responsible for a **Wrongful Act** or an **Occurrence**.

(H)     "**Covered Contract**" means any lease of premises; sidetrack agreement; elevator maintenance agreement; easement or license agreement; or contract or agreement specifically added as a **Covered Contract** by written endorsement to this Policy, under which the **Named Insured** assumes the tort liability of another to pay damages for **Bodily Injury** or **Property Damage** covered by this Policy that is sustained by others.

(I)     "**Defense Expenses**" means the reasonable fees of attorneys, experts and consultants and costs and expenses incurred in the investigation, adjustment, defense or appeal of a **Claim** with the approval or at the direction of the Underwriter; provided that **Defense Expenses** shall not include:

(1)     remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an **Insured**;

(2)     any amounts incurred in defense of a **Claim** for which any other insurer has a duty to defend, regardless whether such other insurer undertakes such duty; or

(3)     any benefits under an **Employee Benefit Program**.

(J)     "**Emergency Medical Treatment**" means emergency medical treatment provided at the **Named Insured's** facility(ies), without remuneration, by a physician who is an **Employee** of, or an independent contractor for, the **Named Insured** to a **Patient** suffering from a life-threatening condition.

(K)     "**Employee**" means: (1) any person who has an assigned work schedule for and is on the regular payroll of the **Named Insured**, with federal and state taxes withheld; and (2) any person who is leased to the **Named Insured** through a temporary or staffing agency and is working for the **Named Insured** under the **Named Insured's** supervision. Independent contractors are not **Employees**. An **Employee's** status as an **Insured** shall be determined as of the date of the **Occurrence** or **Wrongful Act** upon which a **Claim** involving the **Employee** is based.

(L)     "**Employee Benefit Programs**" means any group life insurance, group accident and health insurance, profit sharing plans, pension plans, **Employee** stock subscription plans, workers' compensation, unemployment insurance, social security and disability benefits insurance or any other similar plan under the **Administration** of the **Named Insured** for the benefit of its **Employees**.

(M)     "**Employee Benefit Wrongful Act**" means any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in the **Administration** of an **Employee Benefit Program**.

(N)     "**Employment Practices**" means any of the following: breach of any employment contract; failure or refusal to hire or employ; dismissal, discharge, reduction in force, downsizing or termination of employment, whether actual or constructive; demotion, reassignment, failure or refusal to promote, or deprivation of career opportunity; discipline of **Employees**; evaluation of **Employees**; discrimination or harassment of any kind or on any basis including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy or religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment; humiliation or defamation of any present or former **Employee** or applicant for employment; retaliatory treatment against an **Employee** arising out of the **Employee's** attempted or actual exercise of the **Employee's** rights under the law; employment-related misrepresentations; or failure to implement appropriate workplace or employment policies or procedures.

(O)     "**Evacuation**" means the removal from one or more of the **Named Insured's** facilities to any other location of fifty percent (50%) or more of the **Residents** in such facility(ies) as a result of any natural or man-made occurrence that, in the reasonable judgment of the **Named Insured's** management, causes or could potentially cause such facility(ies) to be unsafe for such **Residents**.

(P)     "**Evacuation Expense**" means reasonable costs incurred in connection with an **Evacuation**, including costs associated with transporting, lodging and providing meals to **Residents** who have been evacuated.  **Evacuation Expense** does not include any remuneration, salaries, overhead or benefit expenses of the **Named Insured**.

(Q)     "**First Named Insured**" means the entity designated as such in ITEM 1 of the Declarations.

(R)     "**Hostile Fire**" means a fire which becomes uncontrollable or breaks out from where it was intended to be contained; provided, that **Hostile Fire** does not include any fire that originates at any site operating as a waste disposal facility or waste storage facility.

(S)     "**Impaired Property**" means tangible property, other than **Insured Product** or **Insured Work**, that cannot be used or is not useful because:

(1)     it incorporates **Insured Product** or **Insured Work** that is known or thought to be defective, deficient, inadequate or dangerous; or

(2)     the **Named Insured** has failed to fulfill the terms of any contract or agreement.

(T)     "**Insured**" means any of the following:

(1)     the **Named Insured**;

(2)     any **Employee** or **Volunteer**; but only when such **Employee** or **Volunteer** is acting within the capacity and scope of his or her duties as such;

(3)     the **Named Insured's** medical directors, department heads, or chiefs of staff, but only while acting within the scope and capacity of their duties as such for the **Named Insured**;

(4)     any member of a duly authorized board or any committee of the **Named Insured**;

(5)     solely with respect to and limited to coverage afforded under INSURING AGREEMENT (A), the lawful spouses of individual **Insureds** and, in the event of the death, incapacity, or bankruptcy of an individual **Insured**, the estates, heirs, legal representatives or assigns of such individual **Insured**;

(6)     solely with respect to and limited to coverage afforded under INSURING AGREEMENT (A), any physician who is an **Employee** of, or independent contractor for, the **Named Insured**, but only while providing **Emergency Medical Treatment**;

(7)     solely with respect to and limited to coverage afforded under INSURING AGREEMENT (A), any licensed beautician and/ or barber who is not an employee of the **Named Insured** but who is invited by the **Named Insured** onto the **Named Insured's** premises to perform **Beauticians and Barbers Professional Services**, but only while performing such **Beauticians and Barbers Professional Services** at the request of the **Named Insured** on the **Named Insured's** premises;

(8)     any person enrolled as a student in a formal training program offered by the **Named Insured** or a subsidiary or an affiliate in connection with the **Named Insured's** on-site operation as a health care organization or provider, but only when such person is acting within the capacity and scope of his or her duties as such;

(9)     any member or partner of a joint venture or partnership specifically listed as a **Named Insured** in Schedule A to this Policy, but only with respect to such member or partner's liability arising out of such joint venture or partnership; and

(10)    any driver or operator of **Mobile Equipment**, but only when operating **Mobile Equipment** at the direction and with the permission of the **Named Insured**;

provided, that **Insured** shall not include any person who is an intern, resident, physician, surgeon, dentist, psychiatrist, nurse anesthetist, nurse midwife, podiatrist or chiropractor while rendering **Medical Services**, whether such person is an **Employee**, **Volunteer** or student, except as specifically provided in clause (6) above.

(U)     "**Insured Product**" means:

(1)     any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      (a)    the **Named Insured**;

      (b)    others trading under the name of the **Named Insured**; or

      (c)    a person or an organization whose business or assets the **Named Insured** has acquired; and

(2)    containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products. **Insured Product** includes:

      (a)    warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the **Insured Product**; and

      (b)    the providing of or failure to provide warnings or instructions.

**Insured Product** includes leased equipment used in or useful to the **Named Insured** in providing its services, but only if the lease for such leased equipment had an original term of six (6) months or more. **Insured Product** does not include vending machines or other property rented to, or located for the use of, others but not sold.

(V)    "**Insured Work**" means:

(1)    work or operations performed by the **Named Insured** or on the **Named Insured's** behalf; and

(2)    materials, parts or equipment furnished in connection with such work or operations. **Insured Work** includes:

      (a)    warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the **Insured Work;** and

      (b)    the providing of or failure to provide warnings or instructions.

(W)    "**Legal/ Media Expense**" means reasonable fees and costs of attorneys, experts and consultants, including third-party media consultants, incurred in the investigation and defense of an actual or alleged **Legal Event**. **Legal/ Media Expense** includes costs incurred in the management of public relations with respect to such **Legal Event**, but does not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of the **Named Insured**.

(X)    "**Legal Event**" means any criminal investigation, criminal complaint, indictment, or administrative, regulatory, disciplinary or licensure proceeding arising out of a **Professional Services Wrongful Act** that happened on or after the **Retroactive Date**.

(Y)    "**Loss**" means **Legal/ Media Expenses**; **Evacuation Expenses;** and any damages, settlements, judgments or other amounts (including punitive or exemplary damages if

insurable under the applicable law most favorable to the insurability thereof) in excess of the applicable deductible or self-insured retention, if any, stated in ITEM 4 of the Declarations which an **Insured** is legally obligated to pay as a result of a **Claim**.  **Loss** shall not include:

(1)     **Defense Expenses**;

(2)     the multiple portion of any multiplied damage award;

(3)     fines, penalties, sanctions, fees, government payments or taxes;

(4)     amounts owed to any provider of **Medical Services** under any contract;

(5)     restitution, return or disgorgement of fees, profits, charges for products or services rendered, capitation payments, premium or any other funds allegedly wrongfully held or obtained;

(6)     benefits under an **Employee Benefits Program**;

(7)     relief or redress in any form other than monetary compensation or monetary damages, including without limitation the cost of complying with any injunctive, declaratory or administrative relief;

(8)     the payment, satisfaction or writing off of any medical bills or charges by an **Insured**; or

(9)     matters which are uninsurable under applicable law.

(Z)     "**Medical Services**" means health care, medical care, or treatment provided to any individual, including without limitation any of the following: medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing, or other professional health care; the furnishing or dispensing of medications, drugs, blood, blood products, or medical, surgical, dental, or psychiatric supplies, equipment, or appliances in connection with such care; the furnishing of food or beverages in connection with such care; the providing of counseling or other social services in connection with such care; and the handling of, or the performance of post-mortem examinations on, human bodies.

(AA)     "**Mobile Equipment**" means any of the following types of land vehicles, including any attached machinery or equipment:

(1)     bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

(2)     vehicles maintained for use solely on or next to premises owned or rented by an **Insured**;

(3)     vehicles that travel on crawler treads;

(4)     vehicles, whether self-propelled or not, maintained primarily to provide mobility to

permanently mounted:

(a)     power cranes, shovels, loaders, diggers or drills, or

(b)     road construction or resurfacing equipment such as graders, scrapers or rollers;

(5)     vehicles not described in clauses (1)-(4) above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(a)     air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(b)     cherry pickers and similar devices used to raise or lower workers; and

(6)     vehicles not described in clauses (1)-(4) above maintained primarily for purposes other than the transportation of persons or cargos.

**Mobile Equipment** does not include self-propelled vehicles with the following types of permanently attached equipment:

(i)     equipment designed primarily for:

(aa)    snow removal;

(bb)    road maintenance but not construction or resurfacing; or

(cc)    street cleaning;

(ii)    cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(iii)   air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

(BB)    "**Mold**" means mold, mildew, spores, mycotoxins, fungi, organic pathogens or other micro organisms of any type, nature or description whatsoever.

(CC)    "**Named Insured**" means the **First Named Insured** and each other entity listed as a **Named Insured** in Schedule A to this Policy.

(DD)    "**Occurrence**" means:

(1)     with respect to **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to substantially the same harmful conditions, which results in injury or damage neither expected nor intended by the **Insured**; and

(2)     with respect to **Advertising Injury** or **Personal Injury**, a covered offense as set forth in DEFINITIONS (C) or DEFINITIONS (FF) of this Policy.

(EE)    "**Patient**" means:

(1)     any person admitted or registered to receive **Medical Services** from an **Insured** on an outpatient basis;

(2)     any person admitted or registered to receive adult day services at the **Named Insured's** facility(ies); and

(3)     any **Resident**.

(FF)    "**Personal Injury**" means injury, other than **Bodily Injury**, arising out of one or more of the following offenses:

(1)     false arrest, detention or imprisonment;

(2)     malicious prosecution;

(3)     the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor; provided, that **Personal Injury** shall not include any injury arising out of a wrongful eviction resulting from any actual or alleged failure to pay or breach of contract;

(4)     oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services; or

(5)     oral or written publication of material that violates a person's right of privacy.

(GG)    "**Policy Period**" means the period from the Inception Date of this Policy stated in ITEM 2(a) of the Declarations to the Expiration Date of this Policy stated in ITEM 2(b) of the Declarations or to any earlier cancellation date of this Policy.

(HH)    "**Pollutant**" means smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, medical waste, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants. **Pollutant** does not include smoke, fumes, vapor or soot emanating from equipment used to heat or cool a building owned or operated by the **Named Insured**.

(II)    "**Products and Completed Operations Hazard**" means **Bodily Injury** and **Property Damage** occurring away from premises owned or rented by the **Insured** and arising out of **Insured Product** or **Insured Work**, except:

(1)     products that are still in the **Insured's** physical possession; and

(2)     work that has not yet been completed or abandoned; provided that work will be deemed completed at the earliest of the following times:

     (a)     when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project;

     (b)     when all of the work called for in the **Insured's** contract has been completed; or

     (c)     when all of the work to be done at a job site has been completed if the **Insured's** contract calls for work at more than one job site.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed work.

**Products and Completed Operations Hazard** does not include **Bodily Injury** or **Property Damage** arising out of:

(i)     the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by the **Insured**, and that condition was created by the loading or unloading of that vehicle by an **Insured**; or

(ii)     the existence of tools, uninstalled equipment, or abandoned or unused materials.

(JJ)     "**Professional Services**" means:

(1)     **Medical Services**;

(2)     **Emergency Medical Treatment**;

(3)     the activities of an **Insured** as a member of a board or committee of the **Named Insured**, or as a member of any committee of the medical or professional staff of the **Named Insured**, when engaged in **Utilization Review**;

(4)     the activities of an **Insured** as a member of a formal accreditation, standards review or similar professional board or committee, including executing the directives of such board or committee; or

(5)     reviewing the quality of **Medical Services** or providing quality assurance on behalf of the **Named Insured**.

(KK)     "**Professional Services Wrongful Act**" means:

(1)     any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in rendering, or failing to render, **Professional Services**;

(2)     any actual or alleged act, error or omission, or series of acts, errors or omissions, by

any person other than an **Insured** in rendering, or failing to render, **Medical Services**, but only for an **Insured's** vicarious liability with regard to such **Medical Services**.  In no event shall this Policy provide coverage for the direct liability of any person other than an **Insured** for the rendering of, or failure to render, **Medical Services**;

(3)     any actual or alleged violation by an **Insured** of the **Rights of Residents**; or

(4)     any **Beauticians and Barbers Professional Services Wrongful Act**.

(LL)     "**Property Damage**" means:

(1)     physical injury to tangible property, including all resulting loss of use of that property; provided, that such loss of use shall be deemed to have occurred at the time of the physical injury that caused it; or

(2)     loss of use of tangible property that is not physically injured; provided, that such loss of use shall be deemed to occur at the time of the **Occurrence** that caused it.

(MM)     "**Related Claims**" means:

(1)     **Claims** for **Wrongful Acts**, or

(2)     **Claims** for **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** caused by an **Occurrence**,

based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events, whether related logically, causally, or in any other way, in any combination, whether or not involving more than one policy, practice, procedure or product, including any course of treatment, and whether or not deemed a continuous tort.

(NN)     "**Resident**" means any person who resides at the **Named Insured's** facility, whether on a short-term or permanent basis.

(OO)     "**Retroactive Date**" means the applicable date(s) set forth in ITEM 3 of the Declarations.

(PP)     "**Rights of Residents**" means:

(1)     any right granted to a nursing home **Resident** under any state law regulating the **Named Insured's** business as a resident health facility; or

(2)     the rights of **Residents** as included in the United States Department of Health and Welfare regulations governing participation of Intermediate Care Facilities or Skilled Nursing Facilities, regardless of whether the **Named Insured's** facility(ies) is/ are subject to such regulations.

(QQ)   "**Utilization Review**" means the process of evaluating the appropriateness or necessity of **Medical Services** provided or to be provided by an **Insured**. **Utilization Review** shall include prospective review of proposed **Medical Services**, concurrent review of ongoing **Medical Services**, and retrospective review of already rendered **Medical Services**. **Utilization Review** does not include services or activities performed in the administration or management of health care plans.

(RR)   "**Volunteer**" means a person who provides his or her services or labor to the **Named Insured**, and whose activities are supervised and directed by the **Named Insured**, but who is not compensated for such services and labor. No **Employee** or physician shall be considered a **Volunteer**.

(SS)   "**Wrongful Act**" means any **Professional Services Wrongful Act** or **Employee Benefit Wrongful Act**.

## III.   EXCLUSIONS

(A)   **Exclusions Applicable to INSURING AGREEMENT (A):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (A), and the Underwriter will not pay any **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)   **Professional Services Wrongful Act** that happened before the **Retroactive Date**;

(2)   **Bodily Injury** or **Property Damage;**

(3)   **Advertising Injury** or **Personal Injury**, except to the extent that such injury relates to the rendering of, or failure to render, **Professional Services**;

(4)   **Employee Benefit Wrongful Act;**

(5)   rendering of, or failure to render, **Medical Services** by any **Insured** or any person for whom an **Insured** is vicariously liable:

(a)   while the **Insured's** or such person's license to practice is or was not active;

(b)   in violation of any restriction imposed or placed upon the **Insured's** or such person's license; or

(c)   if such **Medical Services** fall outside the scope of the **Insured's** or such person's license; or

(6)   rendering of, or failure to render, **Medical Services** by any person other than an **Insured**; except this EXCLUSION (A)(6) will not apply to an **Insured's** vicarious liability with regard to such **Medical Services**.

**(B)**     **Exclusions Applicable to INSURING AGREEMENT (B):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (B), and the Underwriter will not pay any **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)     **Occurrence** that happened before the **Retroactive Date**;

(2)     **Professional Services Wrongful Act**;

(3)     injury to a **Patient**; except this EXCLUSION (B)(3) shall not apply to any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving: fire or lightning; windstorm or hail; explosion; riot, including riot attending a strike or civil commotion; aircraft or vehicles; smoke; vandalism or malicious mischief; sprinkler leakage; elevator malfunction; earthquake or flood; or structural collapse of a building;

(4)     **Bodily Injury**, **Property Damage**, **Personal Injury** or **Advertising Injury** expected or intended from the standpoint of any **Insured**; except for **Bodily Injury** resulting from use of reasonable force to protect persons or property;

(5)     **Personal Injury** or **Advertising Injury** arising out of oral or written publication of material:

(a)     if done by or at the direction of an **Insured** with knowledge of its falsity; or

(b)     whose first publication took place before the **Retroactive Date**. For purposes of this EXCLUSION (B)(5), if such material was first published prior to the **Retroactive Date**, it shall be immaterial whether such material was re-published or allegedly caused injury during the **Policy Period**;

(6)     **Advertising Injury** arising out of any false, incorrect or misleading description of the price of goods, products or services;

(7)     **Employee Benefit Wrongful Act**;

(8)     **Bodily Injury** or **Property Damage** for which an **Insured** is or may be held liable by reason of:

(a)     causing or contributing to the intoxication of any person;

(b)     the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(c)     any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages;

except this EXCLUSION (B)(8) will not apply if the **Insured** is not in the business of manufacturing, selling or distributing alcoholic beverages;

(9)    **Bodily Injury** or **Property Damage** arising out of the ownership, maintenance, use, operation or entrustment to others of any aircraft, auto, watercraft, motor vehicle or semi-trailer or the loading or unloading thereof; except to the extent such injury arises from the loading or unloading of patients or relates to the maintenance or use of non-owned aircraft, watercraft or motor vehicles but only as excess cover over any other insurance, whether collectible or not;

(10)    **Bodily Injury** or **Property Damage** arising out of:

(a)    the transportation of **Mobile Equipment** by, in or on an auto owned or operated by, or rented or loaned to, any **Insured**; or

(b)    the use of **Mobile Equipment** in, or while in practice or preparation for, any prearranged racing, speed, demolition or stunt activity;

(11)    **Bodily Injury** or **Property Damage** arising from any consequence, direct or indirect, of war, invasion, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, strike, riot or civil insurrection;

(12)    **Property Damage** to:

(a)    property the **Insured** owns, rents or occupies;

(b)    premises sold, given away or abandoned by the **Named Insured**, if the **Property Damage** arises out of any part of those premises;

(c)    property loaned to the **Insured**;

(d)    personal property in the care, custody or control of the **Insured**;

(e)    that particular part of real property on which the **Insured**, or any contractor or subcontractor working directly or indirectly on the **Insured's** behalf, is performing operations, if the **Property Damage** arises out of those operations;

(f)    that particular part of any property that must be restored, repaired or replaced because the **Insured's Work** was incorrectly, poorly or improperly performed on it; or

(g)    property which is being transported by the **Insured** by automobile, **Mobile Equipment** or team, including the loading and unloading thereof;

EXCLUSION (B)(12)(a) above does not apply to any **Claim** for **Property Damage** resulting from any fire caused by the **Insured's** negligence and occurring on

HPF-20002-03-09                    15

premises rented by the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises, up to the "Fire Damage" Limit of Liability set forth in ITEM 4.B. of the Declarations;

EXCLUSION (B)(12)(b) above does not apply if the premises are **Insured Work** and were never occupied, rented or held for rental by the **Named Insured**;

EXCLUSIONS (B)(12)(c), (d), (e), and (f) above do not apply to liability assumed under a sidetrack agreement; and

EXCLUSION (B)(12)(f) above does not apply to **Property Damage** included in the **Products and Completed Operations Hazard**;

(13)   **Property Damage** to the **Insured Product** arising out of it or any part of it;

(14)   **Property Damage** to **Insured Work** arising out of it or any part of it and included in the **Products and Completed Operations Hazard**; except if the damaged work or the work out of which the damage arises was performed on behalf of the **Named Insured** by a subcontractor;

(15)   **Property Damage** to **Impaired Property** or property that has not been physically injured, arising out of:

   (a)   defect, deficiency, inadequacy or dangerous condition in **Insured Product** or **Insured Work**; or

   (b)   a delay or failure by an **Insured** or anyone acting on the **Named Insured's** behalf to perform a contract or an agreement in accordance with its terms; except this EXCLUSION (B)(15)(b) does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **Insured Work** after it has been put to its intended use;

(16)   damages claimed for any loss, cost or expense incurred by the **Named Insured** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

   (a)   **Insured Product**;

   (b)   **Insured Work**; or

   (c)   **Impaired Property**, if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it;

(17)   injury or damage arising in whole or in part, either directly or indirectly, out of asbestos, regardless whether the asbestos is:

(a)     airborne as a fiber or particle;

(b)     contained in a product;

(c)     carried or transmitted on clothing or by any other means; or

(d)     contained in or a part of:

(i)     any building;

(ii)    any building material;

(iii)   any insulation product; or

(iv)    any component part of any building, building material or insulation product;

(18)    (a)     exposure to, or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence, reproduction or growth of, **Mold**;

(b)     fee, cost, expense or charge to test, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize, rehabilitate, or in any other way respond to or assess the effect(s) of **Mold**; or

(c)     fee, cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to **Mold**;

except this EXCLUSION (B)(18) will not apply to any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the **Insured's** use of **Mold** in connection with the rendering of **Medical Services**, including medical research activities;

(19)    (a)     exposure to, or generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth of, treatment, removal or disposal of, any **Pollutant**, except where such exposure, generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth, treatment, removal or disposal was caused by an unintentional fire or any heat, smoke or fumes issuing from such unintentional fire;

(b)     fee, cost, expense or charge to test, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize or rehabilitate any **Pollutant**; or

(c)     fee, cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency,

regulatory body or civil, public or military authority in connection with or in any way relating to any **Pollutant**;

except this EXCLUSION (B)(19) will not apply to any **Claim** for **Bodily Injury** or **Property Damage** caused by heat, smoke or fumes from a **Hostile Fire**;

(20)     nuclear reaction, nuclear radiation, radioactive contamination, or radioactive substance; or

(21)     terrorism, including but not limited to, any act(s) of force or violence:

   (a)     for political, religious or other ends;

   (b)     directed or intended to cause the overthrow or influence the government de jure or de facto; or

   (c)     directed or intended to put the public or any part thereof in fear,

committed by any person(s) acting alone, or in connection with or on behalf of any group or organization.

**(C)     Exclusions Applicable to INSURING AGREEMENT (C):**

In addition to the Exclusions listed in EXCLUSION (D) below, no coverage will be available under INSURING AGREEMENT (C), and the Underwriter will not pay any **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)     **Employee Benefit Wrongful Act** that happened before the **Retroactive Date**;

(2)     **Advertising Injury**, **Bodily Injury**, **Personal Injury** or **Property Damage**;

(3)     failure of performance by any insurer;

(4)     failure of securities or other investments to perform as represented or advice given to an **Employee** to participate or not to participate in stock subscription or other benefit programs; provided, that for purposes of this EXCLUSION (C)(4), "security" means a security of any nature whatsoever including, without limitation, stocks, shares, bonds, debentures, options, derivatives, partnership interests, limited liability company interests, any other form of debt or equity instrument and any other forms of ownership interest;

(5)     insufficiency of funds to meet any obligations of **Employee Benefit Programs**; or

(6)     **Professional Services Wrongful Act**.

**(D)** **Exclusions Applicable to All INSURING AGREEMENTS:**

Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Underwriter will not pay **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)    act, error, omission, **Occurrence** or **Wrongful Act** if any **Insured**, on or before the Inception Date set forth in ITEM 2 of the Declarations, knew or reasonably could have foreseen that such act, error, omission, **Occurrence** or **Wrongful Act** might result in a **Claim**.

    If, however, this Policy is a renewal of one or more policies previously issued by the Underwriter to the **First Named Insured**, and the coverage provided by the Underwriter to the **First Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (D)(1) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Underwriter began to provide the **First Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

(2)    act, error, omission, **Occurrence**, **Wrongful Act**, event, suit or demand which was the subject of any notice given under any other policy of insurance or plan or program of self-insurance in effect prior to the Inception Date set forth in ITEM 2 of the Declarations;

(3)    violation of any federal, state or local antitrust, restraint of trade, unfair competition, or price-fixing law, or any rules or regulations promulgated thereunder, or any involvement in any agreement or conspiracy to restrain trade, except for any **Claim** otherwise covered under INSURING AGREEMENT (A) arising out of the rendering of, or failure to render, **Medical Services**;

(4)    dishonest, fraudulent, criminal or intentionally malicious act, error or omission by an **Insured**; any willful violation of law, statute, rule or regulation by an **Insured**; or the gaining of any profit, remuneration or advantage by an **Insured** to which such **Insured** was not legally entitled, including, but not limited to, health care fraud; provided, however, that no such act of one **Insured** will be imputed to any other **Insured** who was not aware of and did not participate in such act;

(5)    obligation of an **Insured** pursuant to any workers' compensation, unemployment compensation, disability benefits or similar law;

(6)    obligation which an **Insured** has assumed under a written or oral contract or agreement; except this EXCLUSION (D)(6) will not apply to:

    (a)    liability an **Insured** would have had in the absence of such contract or agreement; or

(b)     liability assumed by the **Named Insured** under a **Covered Contract**;

(7)     **Claim** made by or for the benefit of, or in the name or right of, one current or former **Insured** against another current or former **Insured**; except this EXCLUSION (D)(7) will not apply to any **Claim** for:

(a)     the rendering of, or failure to render, **Medical Services** otherwise covered under INSURING AGREEMENT (A) of this Policy; or

(b)     any **Employee Benefit Wrongful Act** otherwise covered under INSURING AGREEMENT (C) of this Policy;

(8)     discrimination of any kind on any basis, including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy, religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment, including any discrimination in the rendering of, or failure to render, **Professional Services**;

(9)     **Employment Practices**;

(10)     liability of any "Acquired Entity" described in GENERAL CONDITION (F) or its individual **Insureds** acting in their capacity as such for any **Claim**, **Occurrence**, fact, circumstance, situation, transaction, event or **Wrongful Act** or series of **Claims**, **Occurrences**, facts, circumstances, situations, transactions, events or **Wrongful Acts** happening before the date such entity became an "Acquired Entity;"

(11)     unauthorized or illegal use or release of confidential, private or proprietary information;

(12)     liability of any individual acting as an independent contractor for an **Insured**; except this EXCLUSION (D)(12) will not apply to the **Insured's** vicarious liability with regard to such independent contractor;

(13)     infringement of any right of patent, service mark, trademark, copyright, title or slogan; except this EXCLUSION (D)(13) will not apply to liability of an **Insured** for **Advertising Injury**;

(14)     evaluation of any provider of **Medical Services** by an **Insured** for purposes of selecting, employing, contracting with or credentialing such provider of **Medical Services**, if such **Claim** is made by or on behalf of any such provider of **Medical Services**; or

(15)     violation of the Employee Retirement Income Security Act of 1974 (ERISA), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, all as

may be amended, or any similar federal, state or local statutory or common law, or any rules or regulations promulgated thereunder; except this EXCLUSION (D)(15) will not apply to any **Claim** arising out of the rendering of, or failure to render, **Medical Services**, which is otherwise covered under INSURING AGREEMENT (A) of this Policy and for which reimbursement for such services was received from health care plans covered by such statutes, rules or regulations.

## IV.   GENERAL CONDITIONS

### (A)   Limits of Liability

(1)   Insuring Agreement (A) – Professional Liability

    (a)   The "Each Claim" amount stated in ITEM 4.A. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (A).

    (b)   The "Aggregate for all Claims" amount stated in ITEM 4.A. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (A).

(2)   Insuring Agreement (B) – General Liability

    (a)   The "Each Claim" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (B).

    (b)   The Underwriter's Limits of Liability for **Claims** alleging **Bodily Injury** or **Property Damage** included in the **Products and Completed Operations Hazard** shall be equal to, part of, and not in addition to, the "Each Claim" and "Aggregate for all Claims" amounts stated in ITEM 4.B. of the Declarations.

    (c)   The "Fire Damage" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum aggregate Limit of Liability for all **Claims** for **Property Damage** resulting from any and all fires caused by the **Insured's** negligence and occurring on premises rented to the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises. Such amount shall be part of, and not in addition to, the "Aggregate for all Claims" amount stated in ITEM 4.B. of the Declarations.

    (d)   The "Aggregate for all Claims" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (B).

(3)     Insuring Agreement (C) – Employee Benefit Liability

    (a)    The "Each Claim" amount stated in ITEM 4.C. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

    (b)    The "Aggregate for all Claims" amount stated in ITEM 4.C. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

(4)     Insuring Agreement (D) – Evacuation Expense

    (a)    The "Each Evacuation" amount stated in ITEM 4.D. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Evacuation** for which this Policy provides coverage under INSURING AGREEMENT (D).

    (b)    The "Aggregate for all Evacuations" amount stated in ITEM 4.D. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Evacuations** for which this Policy provides coverage under INSURING AGREEMENT (D).

(5)     Insuring Agreement (E) – Legal/ Media Expense

    (a)    The "Each Legal Event" amount stated in ITEM 4.E. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Legal Event** for which this Policy provides coverage under INSURING AGREEMENT (E).

    (b)    The "Aggregate for all Legal Events" amount stated in ITEM 4.E. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Legal Events** for which this Policy provides coverage under INSURING AGREEMENT (E).

(6)     Each Limit of Liability described in paragraphs (1) through (5) above shall apply regardless of the time of payment by the Underwriter, the number of persons or entities included within the definition of **Insured,** or the number of claimants, and regardless of whether such **Claim** or **Related Claims** is/ are first made during the **Policy Period** or during any Extended Reporting Period.

(7)     (a)    The **Insured** shall be responsible for payment in full of the applicable deductible or self-insured retention stated in ITEM 4 of the Declarations, and the Underwriter's obligation to pay **Loss** or **Defense Expenses** under this Policy shall be excess of such deductible or self-insured retention; provided, that no deductible or self-insured retention shall apply to **Claims**

for **Property Damage** resulting from any fire caused by the **Insured's** negligence and occurring on premises rented to the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises and subject to the "Fire Damage" Limit of Liability set forth in ITEM 4.B. of the Declarations. The applicable deductible or self-insured retention shall apply to each **Claim** or **Related Claims** (subject to the applicable aggregate deductible or self-insured retention amount, if any), and shall be eroded (or exhausted) by the **Insured's** payment of **Loss** or **Defense Expenses**. The Underwriter shall have no obligation whatsoever, either to the **Insured** or any other person or entity, to pay all or any portion of the applicable deductible or self-insured retention on behalf of the **Insured**. The Underwriter shall, however, at its sole discretion, have the right and option to do so, in which event the **Insured** will repay the Underwriter any amounts so paid.

(b)     If a "Deductible" is selected under any Insuring Agreement in ITEM 4 of the Declarations, any amounts paid within such deductible will reduce, and may exhaust, the applicable Limits of Liability for such Insuring Agreement.

If a "Self-Insured Retention" is selected under any Insuring Agreement in ITEM 4 of the Declarations, any amounts paid within such self-insured retention will not reduce the applicable Limits of Liability for such Insuring Agreement.

(8)     All **Insureds** under this Policy share the Limits of Liability. In no event will the number of **Insureds** involved in a **Claim** or **Related Claims** increase the applicable Limit of Liability.

(9)     In the event a **Claim** under this Policy involves more than one (1) Insuring Agreement hereunder, it is understood and agreed that only one (1) deductible or self-insured retention and one (1) Limit of Liability will apply to such **Claim**, which shall be the highest applicable "Each Claim" Limit of Liability stated in ITEM 4 of the Declarations and the deductible or self-insured retention corresponding to such Limit of Liability.

(10)    If any **Claim** made against the **Insureds** gives rise to coverage both under this Policy and under any other policy or policies issued by the Underwriter or any affiliate of the Underwriter, the Underwriter's and, if applicable, such affiliate's maximum aggregate limit of liability under all such policies for all **Loss** in respect of such **Claim** will not exceed the largest single available limit of liability under any such policy, including this Policy. In no event will more than one policy issued by the Underwriter respond to a **Claim**.

**(B)     Related Claims Deemed Single Claim:**

All **Related Claims**, whenever made, shall be deemed to be a single **Claim**, regardless of:

(1)     the number of **Related Claims**;

(2)    the number or identity of claimants;

(3)    the number or identity of **Insureds** involved or against whom **Related Claims** have been or could be made;

(4)    whether the **Related Claims** are asserted in a class action or otherwise; and

(5)    the number and timing of the **Related Claims**, even if the **Related Claims** comprising such single **Claim** were made in more than one **Policy Period**.

All **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made, or when the earliest of such **Related Claims** is treated as having been made in accordance with GENERAL CONDITION (C)(2) below, whichever is earlier.

**(C)**    **Reporting of Claims, Occurrences and Circumstances:**

(1)    If, during the **Policy Period** or any Extended Reporting Period**,** any **Claim** for a **Wrongful Act** or **Occurrence** under INSURING AGREEMENT (A), (B) or (C) is first made against an **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such **Claim** as soon as practicable thereafter, but in no event later than:

(a)    thirty (30) days after the Expiration Date or earlier cancellation date of this Policy; or

(b)    the expiration of any Extended Reporting Period.

Timely and sufficient notice by one **Insured** of a **Claim** shall be deemed timely and sufficient notice for all **Insureds** involved in the **Claim**. Such notice shall give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Wrongful Act** or **Occurrence**; the identity of the patient, all potential claimants and the health care provider(s) and any **Insureds** involved; a description of the injury or damages that resulted from such **Wrongful Act** or **Occurrence**; information on the time, place and nature of the **Wrongful Act** or **Occurrence**; and the manner in which the **Insured** first became aware of such **Wrongful Act** or **Occurrence**.

(2)    If during the **Policy Period** an **Insured** first becomes aware of any **Wrongful Act** or **Occurrence** that may subsequently give rise to a **Claim** under INSURING AGREEMENT (A), (B) or (C) and:

(a)    gives the Underwriter written notice of such **Wrongful Act** or **Occurrence** with full particulars as soon as practicable thereafter but in any event before the Expiration Date or earlier cancellation date of this Policy; and

(b)    requests coverage under INSURING AGREEMENT (A), (B) or (C) of this

Policy for any **Claim** subsequently arising from such **Wrongful Act** or **Occurrence**;

then any **Claim** not otherwise excluded by this Policy subsequently made against the **Insured** arising out of such **Wrongful Act** or **Occurrence** shall be treated as if it had been first made during the **Policy Period**. Full particulars shall include, but are not limited to: a description of the **Wrongful Act** or **Occurrence**; the identity of the patient, all potential claimants and the health care provider(s) and any **Insureds** involved; information on the time, place and nature of the **Wrongful Act** or **Occurrence**; the manner in which the **Insured** first became aware of such **Wrongful Act** or **Occurrence**; and the reasons the **Insured** believes the **Wrongful Act** or **Occurrence** is likely to result in a **Claim**.

(3)     As a condition precedent to its right to any reimbursement under INSURING AGREEMENT (D) or (E) of this Policy, the **Named Insured** shall provide the Underwriter written proof of payment of **Evacuation Expense** or **Legal/ Media Expense** during the **Policy Period**, but in no event later than thirty (30) days after the Expiration Date or earlier cancellation date of this Policy.

**(D)     Defense and Settlement:**

(1)     No **Insured** shall, except at its own cost, incur any expense, make any payment, admit liability for, assume any obligation, or settle any **Claim** without the Underwriter's written consent. With respect to any **Claim,** the Underwriter will have the right to investigate, direct the defense, and conduct settlement negotiations it deems appropriate. The Underwriter may make any settlement of any **Claim** which it deems appropriate.

(2)     The Underwriter will have no obligation to pay **Loss** or **Defense Expenses**, or continue to direct the defense of any **Insured**, after the applicable Limit of Liability has been exhausted by the payment of **Loss**.

(3)     If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred, either because a **Claim** made against the **Insureds** includes both covered and uncovered matters, or because a **Claim** is made against both **Insureds** and others not included within the definition of "**Insured**" set forth in DEFINITION (T) above, the **Insureds** and the Underwriter agree to use their best efforts to determine a fair and proper allocation of all such amounts. The Underwriter's obligation to pay **Loss** under this Policy shall relate only to those sums allocated to the **Insureds**. In making such determination, the parties shall take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/ or settlement of the **Claim** by the **Insureds** and others. In the event that the Underwriter and the **Insureds** do not reach an agreement with respect to an allocation, then the Underwriter shall be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

**(E)**   **Territory:**

This Policy applies to **Wrongful Acts** or **Occurrences** taking place anywhere in the world. **Claim** or suit must be made against an **Insured**, however, in the United States of America, including its territories or possessions, Puerto Rico, or Canada.

**(F)**   **Mergers, Acquisitions or Newly Created Entities:**

If, during the **Policy Period,** the **Named Insured** acquires or creates another entity or subsidiary or becomes a member of a joint venture or partner in a partnership, or if the **Named Insured** merges or consolidates with another entity such that the **Named Insured** is the surviving entity (any such acquired, created, merged or consolidated entity an "Acquired Entity"), then for a period of sixty (60) days after the effective date of the transaction, such Acquired Entity shall be included within the term "**Named Insured**" with respect to **Wrongful Acts** or **Occurrences** happening after the effective date of the transaction.  Upon the expiration of the sixty (60) day period, there will be no coverage under this Policy for any **Claim** in any way involving the Acquired Entity or its **Insureds** unless within such sixty (60) day period:

(1)   the **Named Insured** gives the Underwriter such information regarding the transaction as the Underwriter requests; and

(2)   the Underwriter has specifically agreed by written endorsement to this Policy to provide coverage with respect to such Acquired Entity and its **Insureds**, and the **Named Insured** accepts any terms, conditions, exclusions or limitations, including payment of additional premium, as the Underwriter, in its sole discretion, imposes in connection with the transaction.

For purposes of this GENERAL CONDITION (F), "subsidiary" means any entity for which the **Named Insured** owns or possesses fifty percent (50%) of the issued and outstanding capital stock, or has or controls the right to elect or appoint more than fifty percent (50%) of the directors or trustees.

**(G)**   **Sales or Dissolution of Insured Entities; Cessation of Business:**

If, during the **Policy Period**:

(1)   the **Named Insured** is dissolved, sold, acquired by, merged into, or consolidated with another entity such that the **Named Insured** is not the surviving entity; or

(2)   any person, entity, or affiliated group of persons or entities obtains:

(a)   ownership or possession of fifty percent (50%) of the issued and outstanding capital stock of the **Named Insured,** or;

(b)   the right to elect or appoint more than fifty percent (50%) of the **Named Insured's** directors or trustees; or

(3)      the **Named Insured** ceases to do business for any reason;

(any of which events is referred to as a "Transaction" in this GENERAL CONDITION (G)) coverage under this Policy shall continue in full force and effect until the Expiration Date or any earlier cancellation date, but this Policy shall apply only to **Occurrences** or **Wrongful Acts** happening before the effective date of such Transaction. This Policy will not apply to, and the Underwriter will not pay any **Loss** or **Defense Expenses** for, any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act** or **Occurrence** happening on or after the effective date of such Transaction.

**(H)      Extended Reporting Period for INSURING AGREEMENTS (A), (B) and (C):**

If this Policy is canceled for any reason other than fraud, misrepresentation or non-payment of premium or is not renewed by the Underwriter or the **First Named Insured**, an additional period of time during which **Claims** made under INSURING AGREEMENTS (A), (B) and (C) of this Policy may be reported (an "Extended Reporting Period") shall be made available as described in this GENERAL CONDITION (H), but any such Extended Reporting Period shall apply only to **Claims** for **Wrongful Acts** or **Occurrences** happening before the effective date of such cancellation or non-renewal (the "Termination Date") or the date of any conversion of coverage under GENERAL CONDITION (G), whichever is earlier.  No Extended Reporting Period shall in any way increase the Underwriter's Limits of Liability as stated in ITEM 4 of the Declarations, and the Underwriter's Limit of Liability for **Claims** made during any Extended Reporting Period shall be part of, and not in addition to, the Limits of Liability stated in ITEM 4 of the Declarations.  The Extended Reporting Period will apply as follows:

(1)      An Extended Reporting Period of sixty (60) days, beginning as of the Termination Date, will apply automatically and requires no additional premium; provided, that such Extended Reporting Period will remain in effect only as long as no other policy of insurance is in effect that would apply to any **Claim** made during such Extended Reporting Period.

(2)      In order to purchase an additional Extended Reporting Period, the **First Named Insured** must  (a) provide written notice to the Underwriter requesting such additional Extended Reporting Period no later than thirty (30) days after the Termination Date, and (b) pay any additional premium required by the Underwriter  promptly when due. Such additional premium shall be deemed fully earned upon inception of such Extended Reporting Period.

If no written request to purchase an additional Extended Reporting Period is made by the **First Named Insured** as described in GENERAL CONDITION (H)(2) above, or if the additional premium for any such Extended Reporting Period is not paid promptly when due, there will be no right to purchase an additional Extended Reporting Period at any later time.

**(I)      Cancellation; Non-Renewal:**

(1)      The Underwriter may cancel this Policy by mailing written notice to the **First**

**Named Insured** at the last known address shown on the Declarations stating when, not less than sixty (60) days thereafter (or such longer period of time as required by applicable law), such cancellation shall be effective; except that, in the event of cancellation for non-payment of premium, the Underwriter may make the cancellation effective upon notice of only ten (10) days (or such longer period of time as required by applicable law).

(2)     Except as set forth in GENERAL CONDITION (M), the **First Named Insured** may cancel this Policy by mailing the Underwriter written notice stating when, not later than the Expiration Date set forth in ITEM 2(b) of the Declarations, such cancellation will be effective. In such event, and subject at all times to GENERAL CONDITION (N), the earned premium will be computed in accordance with the customary short rate table and procedure.  Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

(3)     The Underwriter will not be required to renew this Policy upon its expiration.

**(J)     Assistance and Cooperation:**

In the event of a **Claim**, the **Insured** shall provide the Underwriter with all information, assistance and cooperation that the Underwriter reasonably requests. At the Underwriter's request, the **Insured** shall assist in: investigating, defending and settling **Claims**; enforcing any right of contribution or indemnity against another who may be liable to any **Insured**; the conduct of actions, suits, appeals or other proceedings, including, but not limited to, attending trials, hearings and depositions; securing and giving evidence; and obtaining the attendance of witnesses.

**(K)     Subrogation:**

In the event of any payment hereunder, the Underwriter shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insured**. The **Insured** shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Underwriter effectively to bring suit in its name. The **Insured** shall do nothing that may prejudice the Underwriter's position or potential or actual rights of recovery. The obligations of the **Insured** under this GENERAL CONDITION (K) shall survive the expiration or termination of the Policy.

**(L)     Other Insurance and Risk Transfer Arrangements:**

Any **Loss** or **Defense Expenses** resulting from any **Claim** insured under any other insurance or self-insurance policy or program or risk transfer instrument, including, but not limited to, self-insured retentions, deductibles, fronting arrangements, professional liability policies covering any **Insured**, or other alternative arrangements which apply to the **Loss** or **Defense Expenses** shall be paid first by those instruments, policies or other arrangements. It is the intent of this Policy to apply only to **Loss** or **Defense Expenses** that are more than the total limit of all deductibles, limits of liability, self-insured amounts or other insurance or

risk transfer arrangements, whether primary, contributory, excess, contingent, fronting or otherwise and whether or not collectible. These provisions do not apply to other insurance policies or risk transfer arrangements written as specific umbrella or excess insurance over the applicable Limits of Liability of this Policy. This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance; and in no event will the Underwriter pay more than the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

**(M)   Exhaustion:**

If the Underwriter's applicable Aggregate Limit of Liability for any Insuring Agreement, as set forth in ITEM 4 of the Declarations, is exhausted by the payment of **Loss**, all obligations of the Underwriter under such Insuring Agreement will be completely fulfilled and exhausted, including any obligation to pay **Defense Expenses** or to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under such Insuring Agreement.

If all of the Underwriter's applicable Limits of Liability are exhausted by the payment of **Loss**, the premium will be fully earned, all obligations of the Underwriter under this Policy will be completely fulfilled and exhausted, including any obligation to pay **Defense Expenses** or to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under this Policy.

**(N)   Minimum Earned Premium:**

The percentage set forth in ITEM 5.B. of the Declarations is the percentage of the Policy Premium set forth in ITEM 5.A. of the Declarations that shall be deemed fully earned as of the Inception Date set forth in ITEM 2 of the Declarations.

**(O)   Authorization and Notices:**

The **First Named Insured** will act on behalf of all **Insureds** with respect to: the giving or receiving of any notices under this Policy; the payment of premiums to, and receiving of return premiums from, the Underwriter; the receiving and acceptance of any endorsements issued to form a part of this Policy; and the exercising or declining to exercise any Extended Reporting Period.

**(P)   Conformance:**

Any terms of this Policy that are in conflict with the laws or regulations of the state in which this Policy is issued are amended to conform with such laws or regulations.

**(Q)   Representation; Incorporation of Application; Entire Agreement:**

The **Insureds** represent that the particulars and statements contained in the Application attached to this Policy are true, accurate and complete and agree that:

(1)   this Policy is issued and continued in force by the Underwriter in reliance upon the

truth of such representation;

(2)    those particulars and statements are the basis of this Policy; and

(3)    the Application and those particulars and statements are incorporated in and form a part of this Policy.

No knowledge or information possessed by any **Insured** shall be imputed to any other **Insured**, except for material facts or information known to the person or persons who signed the Application. In the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the Application, this Policy shall be void with respect to any **Insured** who knew of such untruth, misrepresentation or omission or to whom such knowledge is imputed.

**(R)    No Action against Underwriter:**

(1)    No action shall be taken against the Underwriter by any **Insured** unless, as conditions precedent thereto, the **Insured** has fully complied with all of the terms of this Policy and the amount of the **Insured's** obligation to pay has been finally determined either by judgment against the **Insured** after adjudicatory proceedings or by written agreement of the **Insured**, the claimant and the Underwriter.

(2)    No individual or entity shall have any right under this Policy to join the Underwriter as a party to any **Claim** to determine the liability of any **Insured**; nor shall the Underwriter be impleaded by an **Insured** or his, her, or its legal representative in any such **Claim**.

**(S)    Notice:**

(1)    Notice to any **Insured** shall be sent to the **First Named Insured** at the address designated in ITEM 1 of the Declarations.

(2)    Notice to the Underwriter shall be sent to the address designated in ITEM 6 of the Declarations.

**(T)    Changes:**

Notice to or knowledge possessed by any agent or other person acting on behalf of the Underwriter shall not effect a waiver or change in any part of this Policy or prevent or estop the Underwriter from asserting any right(s) under this Policy. This Policy can only be altered, waived, or changed by written endorsement issued to form a part of this Policy.

**(U)    Insolvency of Insured:**

The Underwriter will not be relieved of any of its obligations under this Policy by the bankruptcy or insolvency of any **Insured** or his/ her/ its estate.

**(V)**   **Inspections and Surveys:**

The Underwriter or its duly authorized agent has the right but is not obliged to:

(1)   make inspections and surveys of the **Named Insured's** premises and operations at any time;

(2)   provide the **Insured** with reports on the conditions found;

(3)   recommend changes;

(4)   conduct loss control and prevention activity.

Any inspections, surveys, reports, or recommendations relate only to insurability and the premium to be charged.

The Underwriter does not:

(a)   make safety inspections;

(b)   undertake to perform the duty of any entity to provide for the health or safety of workers or the public; nor

(c)   warrant that conditions:

(i)   are safe or healthy; or

(ii)   comply with laws, regulations or codes.

**(W)**   **Examination of Books and Records:**

The Underwriter may examine and audit the books and records of the **Insured** as they relate to this Policy.

**(X)**   **Service of Suit:**

Pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Underwriter hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose by statute, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured**, or any beneficiary hereunder, arising out of this contract of insurance.

**(Y)**   **Assignment:**

No assignment of interest under this Policy shall bind the Underwriter without its written consent issued as a written endorsement to form a part of this Policy.

**(Z)**     **Entire Agreement:**

The **Insureds** agree that this Policy, including the Application and any endorsements, constitutes the entire agreement between them and the Underwriter or any of its agents relating to this insurance.

**(AA)**    **Headings:**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.


**In witness whereof the Underwriter has caused this Policy to be executed by its authorized officers.**